481 A.2d 328

**James H. WILSON and Louella Hynson**

v.

**Ricardo BENJAMIN, Individually and as President of American Federation of Government Employees, Lodge No. 1350 and American Federation of Government Employees, Lodge No. 1350, Appellants.**

Superior Court of Pennsylvania.

Argued Oct. 5, 1983.

Filed July 27, 1984.

212

James A. Lynch, III, Havertown, for appellants.

David C. Harrison, Philadelphia, for appellees.

Before WICKERSHAM, WIEAND and LIPEZ, JJ.

WICKERSHAM, Judge:

This appeal involves a defamation action brought by plaintiffs-appellees James Wilson and Louella Hynson seeking damages from defendants-appellants Ricardo Benjamin, individually and in his capacity as President of the Ameri-

can Federation of Government Employees, Lodge No. 1350, and the Lodge itself, for injuries sustained when Benjamin caused certain articles to be printed and distributed which the appellees allege were libelous in nature.

Both appellees and appellant Benjamin were employees at the United States Naval Hospital in Philadelphia. In November of 1976 appellee James Wilson applied for a promotion to the position of foreman in the food management division of the hospital. The application was made pursuant to a notice that two such positions were open. A rating panel was convened and, after reviewing Wilson's application, the panel rated him as "qualified." Three other applicants were rated "highly qualified;" two of these "highly qualified" applicants were awarded the positions.

Since Mr. Wilson had previously been rated "highly qualified" when he applied for the same position, and because he felt that he had been unfairly rated by the most recent panel, he filed an informal grievance and asked appellee Louella Hynson to act as his representative. Eventually, Wilson retained counsel and filed a formal grievance, which was sustained. Despite the affirmative response to his formal grievance, Wilson was still unable to obtain the desired promotion since the position had already been filled.

In the meantime, while the appellees were involved in the grievance procedure, appellant Ricardo Benjamin, who was president of the appellant union, caused two (2) newsletters to be published which appellees allege to be libelous in nature. One of the newsletters was posted on the bulletin board; the other was distributed directly to union members.

These newsletters referred to the informal grievance filed by appellees. Mr. Wilson had submitted the informal grievance in the form of a letter written by Mrs. Hynson as his representative. In that letter, the appellees questioned the composition of the rating panel in that one of the members of the panel was quite friendly with one of the applicants (who was rated "highly qualified" and was ultimately selected for the position) and that another applicant (who was also rated "highly qualified") was a subordinate of one of

the panel members.  Appellant Benjamin argues that he subsequently wrote the newsletters solely to defend a member of the rating panel whom he felt was being attacked by the appellees' letter and to criticize the conduct of a third party, Thomas Marshall, for his attempt to resort to the "buddy system" to determine who would be promoted. Benjamin testified that the newsletters criticized Marshall's conduct and were not defamatory as to Wilson or Hynson.

The Honorable Ethan Allen Doty, sitting without a jury, found, however, that the newsletters were libelous in nature and that, when read as a whole, they clearly referred to appellees.  The court further concluded that, after their co-workers learned of the contents of the newsletters, appellees' ability to perform in their respective positions was affected.  The court entered a verdict in favor of James Wilson in the amount of $2,500.00 and in favor of Louella Hynson in the amount of $2,500.00 and against appellant Ricardo Benjamin, individually and as president of the American Federation of Government Employees, Lodge No. 1350 and against appellant union.  Punitive damages were denied because, while appellees proved legal malice, actual malice was not established.  Appellants filed exceptions to the verdict, which were denied on March 5, 1982.  This appeal timely followed.

In *Mancini v. Morrow*, 312 Pa.Super. 192, 458 A.2d 580 (1983), we reiterated our scope of review in cases decided by a judge sitting without a jury:

Our appellate role is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. *Brenna v. Nationwide Insurance Co.*, 294 Pa.Super. 564, 567, 440 A.2d 609, 611 (1982); *Metz Contracting, Inc. v. Boxer Heights, Inc.*, 261 Pa.Super. 177, 180, 395 A.2d 1373, 1375 (1978).  The findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as the verdict of a jury, and the findings will not be disturbed on appeal unless predicated upon errors of law or unsupported by competent evidence

in the record. *Eddystone Fire Co. No. 1 v. Continental Insurance Cos.*, 284 Pa.Super. 260, 263, 425 A.2d 803, 804 (1981). When an appellate court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all the evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected. *Brenna v. Nationwide Insurance Co., supra* 294 Pa.Super. at 567–68, 440 A.2d at 611; *Courts v. Campbell,* 245 Pa.Super. 326, 331, 369 A.2d 425, 428 (1976).

*Id.,* 312 Pa.Superior Ct. at 196, 197, 458 A.2d at 582.

With these standards in mind, we now turn to the first issue presented by appellants for our consideration:

Did the lower court have jurisdiction of the libel suit involving a union of federal employees?

Brief for Appellants at 4.

■ Appellants cite 5 U.S.C.A. § 185(c) for the proposition that the jurisdiction of all actions by and against federal labor organizations rests in the United States District Courts. Brief for Appellants at 11. We note that no such statute exists; title 5 of the United States Code does not contain a section 185. We assume, as did the appellees,[1] that appellants are referring to 29 U.S.C. § 185(c), part of the National Labor-Management Relations Act, which provides:

§ 185. (c) Jurisdiction.

For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members.

While this section defines in which district court a specific suit against a labor union may be brought, it does not give

1. *See* Brief for Appellees at 8.

*exclusive* jurisdiction of such cases to the federal courts. Thus, if appellants wanted the suit to be litigated in a federal court, they should have removed the case to the appropriate district court.

■ Furthermore, it is clear from the definition section of the National Labor-Management Relations Act, 29 U.S.C. § 152, that labor unions representing federal employees are not covered by the Act.[2] Thus, the Act is inapplicable to the instant case, and even were it applicable, it does not grant *exclusive* jurisdiction of cases by or against labor unions to the federal courts.

Appellants point out that *Community Medical Services of Clearfield, Inc. v. Local 2665, AFSCME,* 292 Pa.Super. 238, 437 A.2d 23 (1981) held that the National Labor-Management Relations Act, 29 U.S.C. § 141, *et. seq.,* pre-empts the power of state courts to award state remedies in labor dispute defamation cases unless the plaintiff pleads and proves both "actual malice" and damages, even if the alleged defamatory language would be actionable *per se* under state tort law. Brief for Appellants at 11. Appellants would have us decide that the lower court could not award damages since it found that "actual malice" had not been established. However, the lower court found, and we agree, that this case did not involve a union dispute. Appellee Wilson was not a member of the union and his private grievance did not involve the union. Therefore, the defamatory statements made by the union president (Benjamin) cannot be construed to have been made in the context of a labor dispute. Thus, *Community Medical Services* is inapplicable to the instant case.

Appellants' next two arguments assert that the defamatory statements were privileged or otherwise fell into the realm of constitutionally protected free speech:

2. Basically, 29 U.S.C. § 152 provides that a "labor organization" under the Act is an organization made up of "employees;" "employees" are people employed by an "employer;" and the definition of an "employer" specifically excludes the United States Government and its agencies.

Were the alleged libelous publications privileged either absolutely, conditioned or qualifiedly?

. . . .

Did the [Appellants'] publication fall within the realm of constitutionally protected free speech?

Brief for Appellants at 4.

■ Appellants argue that the defamatory statements made by appellants were privileged because they were made upon a proper occasion, from a proper motive, and were based upon reasonable or probable cause. *See Morgan v. Bulletin Co.*, 369 Pa. 349, 352–354, 85 A.2d 869, 872 (1952). In support of their averments, appellants cite a number of cases which held that communications made in the course of grievance procedures in labor matters are conditionally or qualifiedly privileged. Brief for Appellants at 13–17. Appellants argue that the defamatory statements involved a matter of mutual interest to all members of the union and all parties concerned. Thus, discussion of the matter in the newsletters was both proper and privileged.

The lower court, however, found that the defamatory statements were not privileged.

[This] was not a matter of general interest to the union. The only people having any real interest were those in the rating panel, only one or two of which were union members, and possibly the applicants for the positions themselves. [Appellees] made no general attack on the union or Mr. Benjamin. See, *General Motors v. Mendicki*, 367 F.2d 66 (10th Cir.1966). The above case concerned defamatory statements made as part of and in the course of a grievance proceeding. The specific defamation in the instant case ... was clearly made to outsiders of the grievance proceeding, whose statements were not part of the proceeding. Therefore, this matter was not within the concern of the union president to try to resolve by bringing it out in the open.

Lower ct. op. at 5.

We find no error in the lower court's analysis. Wilson's grievance did not involve the union. He did not attack the

union or charge it with any wrongdoing. The grievance concerned only Wilson and his chosen representative, Louella Hynson, the members of the rating panel, and those with whom the grievance was filed. The union had no interest in the grievance filed by appellees; therefore, the defamatory statements published by appellant Benjamin were neither conditionally nor absolutely privileged.

■ Appellants next rely on *Bogash v. Elkins*, 405 Pa. 437, 176 A.2d 677 (1962) for the proposition that the statements published by appellant Benjamin were constitutionally protected free speech. Basically, *Bogash* held that the question of whether the language used in an allegedly defamatory article is indeed libelous is in the first instance a matter of law for the court. *Id.*, 405 Pa. at 438–440, 176 A.2d at 678. The court held that under the facts of that case, although the plaintiff may have had his feelings hurt, he had not been defamed. Instantly, the factual situation is quite different. The lower court found that the statements were libelous in nature and that the appellees had suffered injury because of the defamatory statements. Furthermore, as already discussed, the matter did not concern the union; thus, the statements cannot be excused as involving the "rough and tumble affairs of labor unions." *See* Brief for Appellants at 20. The statements made in the newsletters were not constitutionally protected free speech.

■ Appellants state their next issue as follows:

Was there any specific defamatory or libelous reference made about the individual [Appellees]?

Brief for Appellants at 4.

The lower court found that "[w]hen the articles are read as a whole, it is clear that these statements refer to the plaintiffs." Lower ct. op. at 4. At page six of its opinion, the lower court cited specific examples of defamatory references to the appellees made in the newsletters; we need not go into further detail here. The court did not abuse its discretion in finding that the newsletters contained defamatory allegations that referred to appellees.

Appellants' next issue is:

Was the [Appellant] BENJAMIN actuated by actual malice toward the [Appellees]?

Brief for Appellants at 4.

■ We admit to having difficulty in following appellants' argument with regard to this issue. The lower court specifically held, and we agree, that the appellees failed to establish that appellants' conduct was motivated by actual malice. Thus, the court refused to award punitive damages.

Appellants seem to argue that the statements were not libelous on their face and that the court should not read actual malice into the publication in order to prove that the statements were defamatory. The lower court found, however, that the statements were indeed libelous on their face and that legal malice had been established.

As previously noted, the statements were false and made without just cause, justification or privilege; [appellants] have accused [appellees] of disruptive activities, and fraud in Wilson's attempt to gain a rightful rating. It certainly was done intentionally. The union had no interest in a routine grievance in which the union[']s conduct was at no time challenged, and in which the union was not even asked to be a representative. Therefore, there was 'legal malice.'

Lower ct. op. at 7.

Given this finding of legal malice, the award of compensatory damages was proper despite appellees' failure to establish actual malice.

Appellants state the next issue for our consideration as follows:

Were the statements contained in the alleged publication true or justified?

Brief for Appellants at 5.

■ Appellants' argument as to this issue goes to the credibility of the witnesses and the weight to be given the

evidence. Viewing the evidence in the light most favorable to the appellees as verdict winners, *see Mancini v. Morrow, supra,* we find that the lower court did not abuse its discretion in finding that the defamatory statements were neither true nor justified.

Appellants' final issue is:

Did the [Appellees] suffer any damages as a result of the publication?

Brief for Appellants at 5.

■ The lower court held that the defamatory statements made by appellants were libelous *per se;* that is, they were injurious on their face without the aid of extrinsic proof. Specifically, the newsletters, *inter alia,* falsely accused Wilson of misrepresenting his qualifications for the position sought; accused Hynson of defaming the integrity of a member of the rating panel; and made allegations of breaking and entering and stealing against both appellees. Since the statements were libelous *per se,* appellees did not have to establish special harm. *See* Restatement (Second) of Torts § 569. The court, therefore, awarded general damages.

It is a law of this state that in a defamation action one can be compensated for those injuries which normally flow from the defamation. These include damages for loss of employment, diminished wages, injury to business and reputation, and emotional distress. *Morgan v. The Bulletin Co.,* 369 Pa. 349 [85 A.2d 869] (1952). In this case, plaintiffs have testified to the loss of their reputation by their associates, as well as to their emotional stress which they suffered. Thus, they have proved compensable damages.

Lower ct. op. at 8.

■ It is true that appellants presented evidence which tended to show that appellees suffered no damages as a result of the defamation. Nevertheless, the weight to be given the evidence and the credibility of the witnesses are questions that are to be decided by the fact finder. There is

sufficient evidence to support the lower court's finding that the appellees were injured by the defamatory statements published by appellant Benjamin.

Order affirmed.

WIEAND, J., files a dissenting opinion.

WIEAND, Judge, dissenting:

I respectfully dissent. After analyzing the union newsletters written by Ricardo Benjamin, I am constrained to conclude that they are not capable of a defamatory meaning as to appellees. Therefore, I would reverse the judgment entered in appellees' favor and direct that judgment be entered for appellants.

James Wilson and Louella Hynson were employees of the Philadelphia Naval Hospital. When a rating panel rated Wilson "qualified" but not "highly qualified" for the position of foreman in food management, he filed a grievance. Louella Hynson acted as his representative. While the grievance was pending, Ricardo Benjamin authored and distributed several issues of a union newsletter which Wilson and Hynson contend was defamatory. The learned trial judge, sitting without a jury, found that the newsletters were libelous per se. Although special damages were not proved, he awarded damages to each plaintiff of $2,500.00.

"A man's good name is as much his possession as his physical property. It is more than property, it is his guardian angel of safety and security; it is his lifesaver in the sea of adversity, it is his parachute when he falls out of the sky of good fortune, it is his plank of rescue in the quicksands of personal disaster." Musmanno, J., in *Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 173, 191 A.2d 662, 665 (1963). A communication is defamatory of another's good name if it " 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' Procedurally, it is the function of the court in the first instance to determine whether the communication com-

plained of is capable of a defamatory meaning. The test is the effect the statement would fairly produce, or the impression it would naturally engender, 'in the minds of the average persons among whom it is intended to circulate.' " *Rybas v. Wapner*, 311 Pa.Super. 50, 54–55, 457 A.2d 108, 110 (1983), quoting *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 441 & 447, 273 A.2d 899, 904 & 907 (1971). The meaning of an allegedly defamatory communication must be ascertained by reading the communication as a whole and in context. *Dunlap v. Philadelphia Newspapers, Inc.*, 301 Pa.Super. 475, 482 n.3, 448 A.2d 6, 10 n.3 (1982). "Defamatory words, in order to be actionable, must refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Schonek v. W.J.A.C., Inc.*, 436 Pa. 78, 82–83, 258 A.2d 504, 507 (1969), quoting 22 P.L.E. *Libel and Slander* § 17.

The majority says that statements made in the union's newsletters were libelous per se as to both appellees because they "falsely accused Wilson of misrepresenting his qualifications for the position sought; accused Hynson of defaming the integrity of a member of the rating panel; and made allegations of breaking and entering and stealing against both appellees." (At 333.) A careful analysis of the newsletters, I suggest, discloses that there are no statements which are capable of such a defamatory meaning.[1]

The following excerpted passages are pertinent to the statements regarding Wilson's qualifications:

"[Mr. Wilson's] claim of being a Snapper for 17 years: there is no official record to substantiate such claim[.]" (Plaintiffs' Exhibit #4).

"The panel then was fooled by Wilson['s] claim of 17 years as a snapper, they not being fully informed[,] accepted the 17 years as years of actual work as foreman or supervisor. A snapper is not a supervisor."

1. An analysis is made difficult by what, in charity, might be termed the rambling and disjointed writing style of the author of the newsletters.

(Plaintiffs' Exhibit #5). I am unable to interpret these statements as "allegations" that Wilson lied or falsely misrepresented his qualifications. The writer of the newsletter did no more than comment that experience as a "snapper" did not qualify as "supervisory experience." He also commented that proof of Wilson's experience was lacking. Such statements, in my opinion, cannot be said to engender naturally a belief that Wilson willfully lied so as to lower him in the estimation of his fellow workers. Because there was no defamatory meaning to be drawn from these words, I would hold that the trial court erred when it based an award of damages thereon.

Benjamin also wrote:

"We believe there was [sic] malicious willful attempts made to continue the buddy system by ratings given some applicants[,] ratings which we believe no employee in the Federal Service can honestly justify as deserving.

"We know and is [sic] a party to predetermination in that management officials and us [sic] had so acted in favor of Wilson."

(Plaintiffs' Exhibit #4).

"We can honestly say that our thinking was colored by the high esteem in which Wilson was held and that is borne out in the supervisor evaluation which we believe was an caculative [sic] attempt to carry on the buddy type of promotions. There is no doubt in our minds that had Wilson rated in the top group regardless of where, he would of [sic] been selected and all kind of justification would of [sic] been written by his immedeate [sic] supervisor."

(Plaintiffs' Exhibit #5). These were references to the fact that Wilson had been rated "highly qualified" by prior rating panels. I have read and re-read these statements but am unable to find therein a meaning defamatory of Wilson. At worst, they can be interpreted as a suggestion that Wilson's prior ratings and the high esteem in which he had been held were attributable to high ratings given by a friendly supervisor. To suggest that a person's high rat-

ings were attributable to friendly connections may be offensive to the thin-skinned, but it cannot truly be said to be defamatory. It suggests a reality which is part of the politics of the workplace. There was a very real dispute which existed in this workplace, and there were bound to be differences of opinion and perhaps angry words spoken in support of one side and in derogation of the other. However, "[s]tatements which represent differences of opinion or are annoying or embarrassing, are, without more, not libelous." *Bogash v. Elkins*, 405 Pa. 437, 440, 176 A.2d 677, 679 (1962).

The reference in the newsletter to breaking and entering and stealing, when taken in context, cannot be interpreted as an accusation of a crime. It referred to the taking and copying of a letter which had been posted on a bulletin board. Moreover, the charge was made so generally that it cannot reasonably be interpreted as an accusation against any specific person. The newsletter stated, cryptically, as follows:

"This is a Union with a heart, if not the most serious of charges for breaking and entering and in essence stealing would be filed against those whom open [sic] the locked Union Bullitin [sic] board and took pictures of the letter there in [sic]."

(Plaintiffs' Exhibit #5). This was a general accusation that someone had opened a locked, glass bulletin board in the workplace in order to make a copy of a letter which had been posted thereon. In reality, this was not an accusation that anyone had committed a crime. Even if it could be so construed, moreover, it cannot reasonably be interpreted as an accusation directed against either Wilson or Hynson. A careful reading suggests that the author of the newsletter was unaware of the person or persons who had committed this "terrible" deed. A continued reading of the remaining paragraph discloses a suggestion that if employees wished copies of notices, the union would make them available upon request.

Mrs. Hynson, according to the newsletter, had made a charge against an individual who served on the rating panel "that tends to defame or mar that person [sic] character, dignity, integrity, honesty, or principles and implies conduct unbecoming to society...." An accusation made by Mrs. Hynson against Mrs. Pauline Elliott, a panel member, was said to be "willful, malicious, slanderious [sic], unwarranted and tends to defame and mar the lady [sic] principles." "We are very disturbed," the writer said, "by the attack on [a] specific member of the Panel.... To us the attack on Mrs. Pauline Elliott is malicious, premeditated, willful and intended to defame and destroy Mrs. Elliott's integrity, dignity, principles and dedication to serve. It question [sic] the honor of the board member selected by this Union and there-by is an attack on the Union as well." (Plaintiffs' Exhibit #5). Also

> "The charges against Mrs. Pauline Elliot [sic] is [sic] willful and unwarranted[,] malicious[,] slanderious [sic] and tends to defame and mar: They are allegations made by a third party whom [sic] was not an applicant or whom [sic] did not act in any certified official capacity."

(Plaintiffs' Exhibit #4). A close examination discloses that these are expressions of opinion. They contain no facts. The charges which Mrs. Hynson was alleged to have made against Mrs. Elliott are nowhere recited or disclosed. Instead, the writer appears to have assumed that the specific charges were known to his readers. He added nothing factually, not expressly nor by necessary implication, to the reader's knowledge. He merely characterized the charges allegedly made by Mrs. Hynson according to his own expression of opinion. He did no more than express a judgment upon known or assumed facts. For such an expression of opinion, an action of defamation cannot be sustained. Restatement (Second) of Torts § 566, comment d. "A certain amount of vulgar name-calling is frequently resorted to by angry people without any real intent to make a defamatory assertion, and it is properly understood by reasonable

listeners to amount to nothing more." Restatement (Second) of Torts § 566, comment e.

I would reverse and direct that judgment be entered in favor of appellants.