485 A.2d 447

**Edward RAFFENSBERGER, Richard Muscarello, Arthur Bellamy, Thomas Millard, Warren Stanton, Richard Thieme, Robert Bashore, Brian Burgess, Marlowe Swanson, John Demchak, Nelson Houser, Glenn Ingersoll, Joseph Gambucci, Bruce Parenteau, Arthur Gigantino, Lee Estabrooks, Clint Eshelman, Pat Conway, Horace Drake, Ralph Harris, Thomas Winsor, Harold Yetter, John Teetz, John Nicholson, Jorgen Rasmussen and Joseph Verdier, Appellants,**

v.

**Joseph MORAN and Roadway Express, Inc.**

Superior Court of Pennsylvania.

Argued March 28, 1984.

Filed Nov. 30, 1984.

98

James V. Fareri, Stroudsburg, for appellants.

George W. Westervelt, Jr., Stroudsburg, for appellee.

Before BROSKY, WIEAND and McEWEN, JJ.

WIEAND, Judge:

In this action for libel, the trial court concluded from the pleadings, from pre-trial discovery, and from admissions and affidavits filed by the parties that the statements made by Joseph Moran and alleged to be defamatory of appellants, although capable of a defamatory meaning, were made without malice during a labor dispute. The court, therefore, granted summary judgment dismissing the action. We agree that the remarks were made during a labor dispute and were capable of a defamatory meaning. Because we conclude that the existence of malice was more properly a jury issue, however, we reverse.

On July 7, 1980, Joe Moran, a "relay manager" for Roadway Express, Inc., caused to be sent by telex[1] from Roadway's facility at Tannersville, Monroe County, to twenty-nine Roadway terminals in seven states the following message:

Terminal Managers cc: Wickham Hassler

Re: The Artists

Listed below are the top thirty (30) men (and I use the term loosely) who have broken down the most since the first of the year. They are the ones who are delaying your inbound or outbound. Spending the corporation's money. Do not hesitate to give these individuals my fondest regards upon their arrival at your station.

---

1. The telex is a teletype machine used by Roadway for communication among its terminals.

| | | |
|---|---|---|
| 1. Nicholson | 11. Bellamy | 21. Steele |
| 2. Rasmussen | 12. Ingersoll | 22. Drake |
| 3. Houser | 13. Gagnon | 23. Verdier |
| 4. Bashore | 14. Eshelmann | 24. Simpson |
| 5. Raffensberger | 15. Gambucci | 25. Swanson |
| 6. Muscarello | 16. Millard | 26. Demchak |
| 7. Parenteau | 17. Harris | 27. Winsor |
| 8. Gigantino | 18. Thieme | 28. Conway |
| 9. Estabrooks | 19. Perry | 29. Teetz |
| 10. Burgess | 20. Stanton | 30. Yetter |

Joe Moran

All of the named drivers, except four, joined as plaintiffs in a Complaint in Trespass [2] filed May 14, 1981 in which they alleged that Moran had defamed them by implying that they were "breakdown artists." The term "breakdown artist," they alleged, is used in the trucking business to suggest that drivers are intentionally "breaking down" while on the road and thereby causing unnecessary expense to the owner in the form of delayed transit, additional wages to the drivers and costs of paying vendors to make repairs. Appellants contended that they had been and were continuing to be "irreparably harmed" and unable to obtain work in the trucking business. Moran, they alleged, knew or should have known that their breakdowns had not occurred by virtue of intentional acts.

Discovery depositions disclosed that Moran had compiled his list of "artists" by reviewing company records to determine which drivers had reported the most breakdowns of trucks and/or equipment during the first six months of 1980. The list of thirty included, according to Moran, all drivers who had reported at least five breakdowns during this period. His motivation in sending the telex message, Moran testified, was to publicize their inordinately frequent breakdowns and to "spur the men on" as part of a strategy to reduce breakdowns. The drivers testified in depositions that "breakdown artist" refers to a driver who intentionally breaks down by abusing his equipment or who refuses to

2. The drivers not participating in the lawsuit are Gagnon, Perry, Steele and Simpson.

drive for reasons unjustified by malfunction; such a driver, they said, schemes to take his equipment out of service in order to avoid driving and to collect additional wages.[3] Appellants testified that they had been ridiculed and chastised by other truckers who share the same definition of "breakdown artist."

■ "Ordinarily, summary judgment should only be entered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there exists no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Community Medical Services of Clearfield Inc. v. Local 2665, AFSCME*, 292 Pa.Super. 238, 242, 437 A.2d 23, 25 (1981). See also: *Thorsen v. Iron and Glass Bank*, 328 Pa.Super. 135, 140, 476 A.2d 928, 930 (1984); *Rybas v. Wapner*, 311 Pa.Super. 50, 54, 457 A.2d 108, 109 (1983); Pa.R.C.P. 1035(b). In passing upon a motion for summary judgment, a court must examine the record in the light most favorable to the non-moving party. *Pocono International Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 83, 468 A.2d 468, 470 (1983); *Zimmerman v. Zimmerman*, 322 Pa.Super. 121, 124, 469 A.2d 212, 213 (1983). "It is not part of the court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried." *Thorsen v. Iron and Glass Bank, supra*, 328 Pa.Super. at 141, 476 A.2d at 931; *Wilk v. Haus*, 313 Pa.Super. 479, 482, 460 A.2d 288, 290 (1983). Any doubt must be resolved against the moving party. *Chorba v. Davlisa Enterprises, Inc.*, 303 Pa.Super. 497, 500, 450 A.2d 36, 38 (1982).

■ A communication is defamatory of another's good name "if it 'tends so to harm the reputation of [the other] as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' Procedurally, it is the function of the court in the first

---

3. Drivers are normally paid by the mile, but when their trucks or other equipment prevent them from driving, they are paid $12.75 per hour until their trucks can again be driven.

instance to determine whether the communication complained of is capable of a defamatory meaning. The test is the effect the statement would fairly produce, or the impression it would naturally engender, 'in the minds of the average persons among whom it is intended to circulate.' " *Rybas v. Wapner, supra,* 311 Pa.Super. at 54–55, 457 A.2d at 110, quoting *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 441 & 447, 273 A.2d 899, 904 & 907 (1971). The meaning of an allegedly defamatory communication must be ascertained by reading the communication as a whole and in context. *Agriss v. Roadway Express, Inc.,* 334 Pa.Super. 295, 305, 483 A.2d 456, 461 (1984); *Dunlap v. Philadelphia Newspapers, Inc.,* 301 Pa.Super. 475, 482 n. 3, 448 A.2d 6, 10 n. 3 (1982). See also: *Wilson v. Benjamin,* 332 Pa.Super. 211, 223, 481 A.2d 328, 334 (1984) (Wieand, J., dissenting). Its meaning is "that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." *Laniecki v. Polish Army Veterans Association,* 331 Pa.Super. 413, 430, 480 A.2d 1101, 1109 (1984), quoting Restatement (Second) of Torts § 563 (1977). See generally: *Rutt v. Bethlehems' Globe Publishing Co.,* 335 Pa.Super. 163, 484 A.2d 72.

 We agree with the trial court that Moran's telex message was capable of a defamatory meaning. It was susceptible to an interpretation which suggested that the named drivers were contriving equipment failures and exploiting minor malfunctions dishonestly in order to obtain additional compensation and thereby injure Roadway by causing unnecessary expense. A driver with such a reputation, a jury could find, would be held in low esteem by owners and drivers alike, would be subjected to ridicule by drivers and terminal managers, and would experience increased difficulty in obtaining future work. Because the telex message was capable of a defamatory meaning, it will be for a jury to determine whether it was so understood. Merely because it was also capable of an innocuous interpretation, as appellees contend, does not conclusively defeat

appellants' causes of action. *Agriss v. Roadway Express, Inc., supra,* 334 Pa.Super. at 308, 483 A.2d at 462.

In *Linn v. United Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the United States Supreme Court considered the pre-emptive effect of the National Labor Relations Act (NLRA), as amended, 29 U.S.C. § 151 et seq., on the power of state courts to award remedies in defamation cases arising in the context of "labor disputes." The Court concluded that, although Congress did not intend to pre-empt labor-related defamation actions entirely, the availability of state remedies for defamatory statements made in the course of a labor dispute should be limited "to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage." *Id.,* 383 U.S. at 64–65, 86 S.Ct. at 664, 15 L.Ed.2d at 591. The Supreme Court elected to adopt the "actual malice" standards of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) by analogy, rather than under constitutional compulsion, in order "to effectuate the statutory design" of the NLRA. The Court said: "Construing the Act to permit recovery of damages in a state cause of action only for defamatory statements published with knowledge of their falsity or with reckless disregard of whether they were true or false guards against abuse of libel action, and unwarranted intrusion upon free discussion envisioned by the Act." *Linn v. United Plant Guard Workers, supra,* 383 U.S. at 65, 86 S.Ct. at 664, 15 L.Ed.2d at 591.

Left undefined in *Linn,* which involved an allegedly libelous leaflet distributed during a union organization campaign, was a standard by which to determine whether or not a defamatory publication arose in the course of a "labor dispute." The appellant drivers in this case contend that *Linn* is to be applied only where the libelous statement is either made in the context of a labor dispute regulated by the NLRA, or where it arguably constitutes either "protected employee activity" under section 7 of the Act, 29 U.S.C.

§ 157, or an "unfair labor practice" under section 8, 29 U.S.C. § 158.

Clearly, *Linn* is not limited to situations involving the provisions of sections 7 and 8 of the NLRA. The application of *Linn*, rather, turns on the scope of judicial definition of a "labor dispute" in the context of a libel case. As defined by Congress in the NLRA, a "labor dispute" is "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 152(9). This definition, it has been said, is to be broadly and liberally construed in libel cases. *Aarco, Inc. v. Baynes*, 391 Mass. 560, 562, 462 N.E.2d 1107, 1110 (1984). The United States Supreme Court sharpened the definitional focus of "labor dispute" in *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). There the defendant argued that no "labor dispute" had existed within the meaning of *Linn* because there had been "no dispute between labor and management," and because the organizing efforts of the union, which had allegedly defamed non-union workers by referring to them as "scabs," had been made "neither during the course of a representation election campaign nor directed toward achieving recognition." The Court countered: "But whether *Linn's* partial pre-emption of state libel remedies is applicable obviously cannot depend on some abstract notion of what constitutes a 'labor dispute'; rather, application of *Linn* must turn on whether the defamatory publication is made in a context where the policies of the federal labor laws leading to protection of freedom of speech are significantly implicated." *Id.*, 418 U.S. at 278–29, 94 S.Ct. at 2778, 41 L.Ed.2d at 758–759.

"Labor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed

actionable *per se* in some state jurisdictions." *Linn v. United Plant Guard Workers, supra,* 383 U.S. at 58, 86 S.Ct. at 660–661, 15 L.Ed.2d at 587. "[The] freewheeling use of the written and spoken word ... has been expressly fostered by Congress and approved by the NLRB.[4] Thus, ... there was 'a congressional intent to encourage free debate on issues dividing labor and management.' " *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin, supra,* 418 U.S. at 272, 94 S.Ct. at 2775, 41 L.Ed.2d at 755 (footnote added). This arises from " 'a profound ... commitment to the principle that debate ... should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks.' " *Linn v. United Plant Guard Workers, supra,* 383 U.S. at 62, 86 S.Ct. at 663, 15 L.Ed.2d at 590, quoting *New York Times Co. v. Sullivan, supra,* 376 U.S. at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701. It is against this backdrop that we determine whether appellees in the instant case are entitled to the protections afforded by *Linn.*

Depositions reveal that there were occasions on which Moran complained to some of the drivers that their breakdowns had been unnecessary or suspiciously frequent. The drivers, on the other hand, attributed excessive breakdowns to poorly maintained equipment which resulted in loss of lights, broken windshield wipers, loss of engine power and other assorted problems. Although no full-blown controversy or dispute had manifested itself prior to the Moran communique and although many drivers had been unaware of Moran's expressed complaint that intentional breakdowns had become commonplace among certain drivers, it is apparent that a controversy existed. Moran was of the opinion that frequent breakdowns were being caused by the drivers, while the drivers attributed their inordinate number of breakdown experiences to the age and condition of the trucks and trailers they were required to use. The telex message did not create the controversy or

4. National Labor Relations Board.

dispute but was a product of that dispute. It brought the dispute to the attention of the accused drivers and also to the attention of other employees of the company. It must be concluded, therefore, that the telex message arose from and was related to a controversy or dispute between management and certain employees. That controversy, it seems clear, pertained to "conditions of employment." Driving tractor-trailer rigs on public highways without reasonably safe and operational equipment would present a danger to the driver and also to other motorists and pedestrians. A driver who was in fear of accusations that his breakdowns were intentional would logically and understandably be more likely to continue driving with a dangerous but not disabled vehicle. On the other hand, the company was necessarily concerned about careless use or intentional damage that caused its equipment to be removed from the road. Because the dispute was related to a "condition of employment" we hold that it must be deemed a "labor dispute."

It is "where the policies of the federal labor laws leading to protection of freedom of speech are significantly implicated" that *Linn* applies. *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin, supra,* 418 U.S. at 279, 94 S.Ct. at 2778, 41 L.Ed.2d at 758–759. Those policies are not intended to foster free speech only during organizational campaigns. See: *Davis Co. v. United Furniture Workers,* 674 F.2d 557, 562 (6th Cir.), *cert. denied,* 459 U.S. 968, 103 S.Ct. 296, 74 L.Ed.2d 279 (1982). Nor are they designed only for situations in which a labor union is directly involved. But see and compare: *Wilson v. Benjamin, supra,* 332 Pa.Super. at 217–218, 481 A.2d at 331. Freedom of speech in labor matters is necessary because of the symbiotic and often adversarial relationship between labor and management in the workplace. Labor and management are allies and adversaries at the same time; both employer and employee work together for a common goal—the success of the enterprise in which they are engaged. In the work place, however, the personal goals and

values of management are frequently divergent from those of labor and result in antagonism and belligerence born of the vitality of their interests and the extensiveness of their interrelationship. Disagreements between management and labor are often intense; words are carelessly and tactlessly spewn and attacks and accusations hurled. This freewheeling use of words has been fostered by Congress to encourage free debate on those issues which divide labor and management. The issue dividing Moran, who represented management, and the appellant drivers constituted the type of dispute foreseen by Congress to be attended by epithets and accusations. It represented a classic example of the divergent interests of management and labor. Moran perceived a gap in the efficient operation of the business and blamed the driver employees. The drivers, on the other hand, were motivated by what they perceived to be inadequate safety and poor work conditions which they attributed to management's failure to maintain its equipment properly. Thus, although the bargaining unit had not become directly involved, the controversy from which Moran's communique arose was no less a "labor dispute" within the *Linn* rule.

It follows that appellants are not entitled to recover damages in this action unless they can prove with "convincing clarity" that Moran acted with "actual malice." To show actual malice, the appellant drivers must prove that Moran's communication was made with knowledge that it was false or with reckless disregard for whether it was false. *New York Times Co. v. Sullivan, supra; Corabi v. Curtis Publishing Co., supra; Brophy v. Philadelphia Newspapers Inc.*, 281 Pa.Super. 588, 595, 422 A.2d 625, 629 (1980). In the record now before us, there is no basis for a finding that Moran's message was knowingly false. The company's records confirm that the named drivers experienced a greater number of breakdowns than drivers who were not named. We focus, therefore, on whether a jury could find that Moran's accusations were made with a reckless disregard for the truth.

■ " 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication...." *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). The "cases are clear," however, "that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.,* 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267. "A showing of no more than negligence, carelessness, bad judgment or inaccuracy in the preparation and publication of an allegedly defamatory [communication] is ... insufficient to show the recklessness needed to prove actual malice." *Brophy v. Philadelphia Newspapers Inc., supra,* 281 Pa.Super. at 602, 422 A.2d at 633.

■ "[T]he summary disposition of [actual malice] defamation cases differs in no way from the manner of disposing of other cases in like procedural posture." *Community Medical Services of Clearfield Inc. v. Local 2665, AFSCME, supra,* 292 Pa.Super. at 243, 437 A.2d at 26 (footnote omitted). There is no "rule" favoring summary disposition of defamation actions. *Braig v. Field Communications,* 310 Pa.Super. 569, 588–589, 456 A.2d 1366, 1377 (1983) (allocatur refused June 24, 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2341, 80 L.Ed.2d 816 (1984), citing *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411, 422 n. 9 (1979). "If the evidence ... measures up to the *New York Times* standard, the case is one for the jury.... [T]he function of the trial court [on motion for summary judgment] is not to weigh proof and make independent findings, but rather to determine whether or not the plaintiff has demonstrated a genuine issue of material fact from which a jury, using the appropriate burden of proof—'clear and convincing' evidence—*could find* publication of a defamatory falsehood with actual malice." *Community Medical Services of*

*Clearfield Inc. v. Local 2665, AFSCME, supra,* 292 Pa.Super. at 246, 437 A.2d at 27 (emphasis in original), quoting *Nader v. deToledano,* 408 A.2d 31, 47 (D.C.1978), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). "The proof of 'actual malice' calls a defendant's state of mind into question, and does not readily lend itself to summary disposition." *Curran v. Philadelphia Newspapers, Inc.,* 497 Pa. 163, 184, 439 A.2d 652, 662 (1981) (citation omitted), quoting *Hutchinson v. Proxmire, supra,* 443 U.S. at 120 n. 9, 99 S.Ct. at 2680 n. 9, 61 L.Ed.2d at 422 n. 9. "[A] defendant in a defamation action cannot insure a favorable verdict [merely] 'by testifying that he published with a belief that the statements were true.' " *Id.,* 497 Pa. at 184–185, 439 A.2d at 662, quoting from *St. Amant v. Thompson, supra,* 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267 (1971) and applying *Nanty Glo Boro. v. American Surety Co.,* 309 Pa. 236, 163 A. 523 (1932). See also: *Skowronski v. Bailey,* 330 Pa.Super. 83, 88, 478 A.2d 1362, 1365 (1984).

■■■ In the instant case, Moran's information was based upon company records pertaining to the frequency of breakdowns experienced by appellant drivers. Although he denied in depositions that he had a malicious intent, Moran conceded that his purpose was to encourage improved performance. He also conceded that the company's records did not reveal and he did not know the reasons for the breakdowns experienced by the plaintiff drivers. Under these circumstances, a jury could find that Moran's statement to the effect that the drivers were dishonestly contriving breakdowns, if such is ultimately determined to be the meaning of the label "breakdown artists," was made recklessly without regard for the truth of his statement. Because the existence of "actual malice" was a question of fact for a jury, we are constrained to hold that the entry of summary judgment was error.

Reversed and remanded for further proceedings. Jurisdiction is not retained.