J-A27009-17

**NON-PRECEDENTIAL DECISION-SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DONALD J. FREUND<br><br>       APPELLANT<br>         v.<br><br>LINDA A. BRADEN-FREUND<br><br>         v.<br><br>GREATER PITTSBURGH TRAP AND SKEET, INC., M. CONSTANCE GATO, EXECUTRIX, UNDER THE LAST WILL AND TESTAMENT OF MARGARET S. FREUND, DECEASED, M. CONSTANCE GATO, MARY DAWN DRUMMOND, J. DONALD FREUND AND MARK J. FREUND | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br><br><br><br>NO. 1196 WDA 2016 |

Appeal from the Order Entered July 18, 2016
in the Court of Common Pleas of Washington County
Civil Division at No(s): C-63-CV-200402627

BEFORE:  BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JANUARY 19, 2018**

Donald J. Freund (Husband) appeals from the July 18, 2016 order, entered after remand from this Court,[1] that essentially reinstated the April 14, 2011 decree in divorce and the equitable distribution scheme contained therein.  After extensive review, we affirm.

---

[1] **See Freund v. Baden-Freund**, 91 A.3d 1279 (Pa. Super. 2013) (unpublished memorandum).

This litigation began in 2004 when Husband filed a complaint in divorce and Linda A. Braden-Freund (Wife) filed a counterclaim in divorce. This case has continued unabated since that time. Following the remand as directed by this Court in a memorandum opinion filed in 2013, further proceedings were held before the trial court and the order from which Husband now appeals was entered on July 18, 2016.

In the present appeal, Husband raises the following four issues:

1. Whether the trial court erred as a matter of law and/or abused its discretion in relying on a transcript from an unrelated proceeding that was never offered or received into evidence, when rendering its decision[?]

2. Whether the trial court erred as a matter of law and/or abused its discretion in determining that the increased value of a corporation which [Husband] managed but in which he never held any ownership interest, constituted marital property subject to equitable distribution[?]

3. Whether the trial court erred as a matter of law and/or abused its discretion by misapplying the doctrine of "piercing the corporate veil" or otherwise in ignoring the corporate form to determine that [Husband] was the "de facto" owner of said corporation[?]

4. Whether the trial court erred as a matter of law and/or abused its discretion in determining that [Wife] did not waive her right to appreciation and/or increase in value of premarital property under the terms of the parties' prenuptial agreement[?]

Husband's brief at 6-7.

Generally, in addressing the types of issues raised in this appeal, we are guided by the following:

Our standard of review in assessing the propriety of a marital property distribution is whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure. An abuse of discretion is not found lightly, but only upon a showing of clear and convincing evidence.

**McCoy v. McCoy**, 888 A.2d 906, 908 (Pa. Super. 2005) (citations omitted).

When reviewing an award of equitable distribution, "we measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights." **Hayward v. Hayward**, 868 A.2d 554, 559 (Pa. Super. 2005). Moreover, it is within the province of the trial court to weigh the evidence and decide credibility and this Court will not reverse those determinations so long as they are supported by the evidence. **Sternlicht v. Sternlicht**, 822 A.2d 732, 742 n.8 (Pa. Super. 2003), *aff'd*, 876 A.2d 904 (Pa. 2005).

We have reviewed the certified record, the brief filed by Husband and the responsive brief filed by Wife, the relevant law, and the extensive, well-reasoned analysis provided by the Honorable John F. DiSalle of the Court of Common Pleas of Washington County in his opinion, dated July 20, 2017. We conclude that Judge DiSalle's opinion correctly disposes of the issues raised by Husband and, accordingly, we adopt that opinion as our own and affirm the order on that basis.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/19/2018

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
CIVIL DIVISION

J. DONALD FREUND,                              )
                                               )
            Plaintiff,                         )
                                               )
       v.                                      )        No. 2004-2627
                                               )        1196 WDA 2016
LINDA A. BRADEN-FREUND,                        )
                                               )
            Defendant.                         )
                                               )
       v.                                      )     ENTRY OF OPINION, ORDER, DECREE, 7-20-17
                                               )     ADJUDICATION OR JUDGMENT FILED
GREATER PITTSBURGH TRAP AND                    )     MAILED 7-21-17
SKEET, INC., M. CONSTANCE GATO,                )     TO  T. Vreeland, Esq
EXECUTRIX, under the Last Will and             )
Testament of MARGARET S. FREUND,               )
Deceased, M. CONSTANCE GATO,                   )
MARY DAWN DRUMMOND,                            )
J. DONALD FREUND and MARK J.                   )
FREUND,                                        )
                                               )
            Additional Defendants.             )

## OPINION

This matter comes before the Superior Court of Pennsylvania on appeal from the

trial court's order of July 18, 2016, reinstating its decree of equitable distribution and

final divorce decree dated April 14, 2011. The order appealed from was entered after

consideration of additional testimony and evidence offered, and review of the entire

record following remand by the Superior Court pursuant to the Memorandum Opinion

dated November 8, 2013.[1] Plaintiff, appellant J. Donald Freund (hereinafter referred to

as "Husband") filed a timely appeal from the July 18, 2016 order, docketed at No. 1196

WDA 2016.

---

[1] No. 779 WDA 2011.

1

Appendix C

## The Parties:

The original parties to this divorce action are plaintiff, Husband and defendant Linda A. Braden-Freund (hereinafter referred to as "Wife"). By Memorandum Opinion dated November 8, 2013, the Superior Court found that, with respect to the trial court's decision regarding the value of the marital estate, the estate of Husband's mother, Margaret Freund, its heirs, and the corporation known as Greater Pittsburgh Trap and Skeet, Inc. (hereinafter referred to as the "Gun Club") were indispensable parties to the litigation "because any equitable distribution scheme would affect their rights in the property."[2] As set forth below, the Superior Court acknowledged that this case did not involve the distribution of any of the Gun Club's assets or assets of Mother's estate, but nevertheless vacated the order of equitable distribution and directed "the trial court to join these parties and conduct a *de novo* hearing."[3]

In accordance with the Superior Court's order of remand, the trial court entered an order dated August 5, 2014, amending the caption of the case to include as additional defendants, the corporate entity known as Greater Pittsburgh Trap and Skeet, Inc. (the "Gun Club"), M. Constance Gato, Executrix under the Last Will and Testament of Margaret S. Freund, deceased (hereinafter referred to as "Mother's estate"), and the individual heirs of Mother's estate, M. Constance Gato, Mary Dawn Drummond, J. Donald Freund (Husband), and Mark J. Freund.

## Procedural and Factual History:

The parties were married on December 1, 2001. On April 30, 2004, Husband filed a Complaint in Divorce, alleging that the parties' marriage was irretrievably broken.

---

[2] Superior Court Opinion, No. 779 WDA 2011, p. 17, note 5.
[3] *Id.*

2

On May 19, 2004, Wife filed a Counterclaim in Divorce, likewise alleging that the marriage was irretrievably broken. In addition, Wife's counterclaim included individual counts for equitable distribution, alimony *pendent lite,* alimony, and for counsel fees, costs and expenses. Prior to their marriage, on November 27, 2001, the parties had entered into a prenuptial agreement providing, among other things, that all property belonging to either party at the time of the agreement was executed as well as any proceeds generated by these assets would remain the sole and separate property of the party owning the asset at the time of the execution of the Agreement. The prenuptial agreement did not exclude from the marital estate any appreciation or increase in value of the premarital property, nor did the parties waive their right to claim alimony, alimony *pendente lite* or counsel fees.

The predominant issue of contention during the divorce proceedings and on appeal was Husband's ownership interest in the business known as Greater Pittsburgh Trap and Skeet, Inc. (hereinafter the "Gun Club"). The corporate entity which owned the Gun Club business was purportedly titled in the name of Husband's Mother. However, Husband operated and managed the Gun Club, lived in the business premises, owned the property on which the business was located and controlled all of the business accounts. Nevertheless, Husband claimed to have no ownership interest the Gun Club and continues to maintain that the appreciation in its value should not have been considered in the marital estate. Husband further claimed to receive no compensation for operating the Gun Club business even though the business reported significant annual income. From the outset, Wife disputed Husband's claim, asserting that all evidence and circumstances

3

indicated that Husband was the true owner of the Gun Club and all of its assets and income.

On May 28, 2004, the trial court signed an order appointing divorce master Thomas C. Panian, Esquire to hear testimony and submit recommendations with respect to the divorce, equitable distribution, counsel fees and alimony *pendente lite*. Prior to the proceedings before the divorce master, Wife's counsel presented a petition alleging that Husband was in sole control of the assets and financial records that would be necessary for the proceedings, and that depositions would be necessary to determine the parties' sources of income. Wife's Counsel also presented a Petition for Special Relief requesting that the Court enter an order allowing her to enter the marital residence to retrieve non-martial personal property and inventory marital property for appraisal purposes. In response, the Court ordered that Husband pay Wife $3,000.00 to Wife within seven days, which amount would be deducted from the ultimate settlement or final decree in the matter. Additionally, the Court enjoined both parties from dissipating, alienating or encumbering any marital assets pending further order. Following a second Petition for Special Relief that alleged that Wife required additional funds to conduct further discovery, the Court, on October 25, 2004, issued an order directing Husband to pay Wife an additional $5,000.00 for which Husband was given credit against any award made to Wife by way of settlement or final decree.

On September 12, 2005, following four (4) hearings regarding the issues of alimony *pendente lite* and counsel fees, the divorce master entered a Preliminary Report, which recommended that Husband pay to Wife the sum of $1,086.00 per month as APL and recommended that arrearages be set at $19,573.00 and be retired at the rate of

4

$350.00 per month. The divorce master further recommended that Husband pay to Wife $8,500.000 as preliminary attorney's fees. Husband then filed timely exceptions to the Master's Preliminary Report. By an Opinion and Order dated June 29, 2006, the trial court dismissed Husband's exceptions.[4]

Following the conclusion of the hearings, the divorce master[5] issued a Report and Recommendation regarding marital property, equitable distribution and alimony. The master found that Husband had made all payments required of him by the Court's August 5, 2004 and October 25, 2004 Orders. In addition, the master found, for purposes of determining equitable distribution, alimony, and counsel fees and expenses, that Husband had an annual net earning capacity of $54,000.00,[6] while Wife had an annual earning capacity of $23,000.00.[7] The master made these findings with strong consideration of the findings of the former divorce master Panian as set forth in the Preliminary Report on Alimony *Pendente Lite* and Counsel Fees.[8]

The master next made findings regarding a number of items of premarital and marital personalty. First, the master found that Husband, on December 12, 2000, purchased a 2001 Ford Taurus automobile and that it was premarital property with no increase in value during the marriage, which would not be considered for purposes of

---

[4] At issue before the master at that proceeding was Husband's ownership of the Gun Club. The trial court could not ignore the compelling report and testimony of Wife's expert, Gregory Clark, CPA, CVA, of Brabender Mascetta, LLC, or Husband's own admissions regarding his control of the Club's financial affairs. Accordingly, the trial court found the evidence clearly supported the master's finding that the income from the Gun Club belonged to Husband. Furthermore, even had the court overlooked the evidence and found that Husband was, as he claimed, merely an unpaid business manager of the Club, the trial court could nevertheless impute income to him in accordance with his responsibilities as the general manager of the Gun Club. The trial court found that it was fair to impute to Husband, as a business manager of a going concern of that magnitude, a net annual income of $53,442.00, as was determined by the master.
[5] Stephen Ferito, Esquire succeeded Thomas Panian as the divorce master upon Mr. Panian's retirement.
[6] This amount of income was imputed based on the master's finding regarding Husband's managing the business of the Gun Club.
[7] In making this recommendation, the master acknowledged the fact that Wife's educational background was superior to that of Husband.
[8] Master Ferito noted that the evidence presented at the hearings subsequent to the filing of master Panian's report did not lead him to reach any different conclusions regarding the earnings or earning capacities of the parties.

5

equitable distribution. Next, Husband claimed that, prior to the marriage, he lent the sum of $3,500.00 to Wife which had not been repaid, which the master determined that, since the loan was made prior to the marriage, was clearly not marital property or marital debt, and not to be considered for equitable distribution purposes.

The master then addressed the issues of the engagement ring and personalty. He found the record established that, prior to the marriage, Husband gave an engagement ring to Wife the main stone of which was taken from an heirloom ring of his family. The parties had an understanding that, if the marriage did not survive, the stone would be returned to Husband. Therefore, the master recommended that Wife return the heirloom stone to Husband. Additionally, the master found that Husband gifted a wedding dress with a value of $498.00 to Wife, which Husband refused to return to her. The master recommended that Husband return it to Wife or, in the alternative, pay Wife the sum of $498.00. The master also found that Wife received or had the opportunity to obtain all of the items of personalty from the marital residence that she desired. Additionally, the master determined that the record did not establish that any other items of Wife's personal property existed.

With regard to Wife's claim for the distribution of Husband's investment assets, the Master found that the record clearly established that all of the investment assets in existence as of the date of separation were covered by the terms of the prenuptial agreement. Although some investment accounts in existence at the time of separation did not exist at the date of the marriage, they were, in fact, re-investments of funds that existed at the date the parties signed the prenuptial agreement. Therefore, the master

6

found that the assets were generated from accounts covered by the prenuptial agreement and not subject to equitable distribution.[9]

With regard to the parties' real property, during the marriage, the parties purchased a timeshare for $11,076.00 and a membership to a "Vacation Club" at a cost of $2,500.00. The master found that both the timeshare and membership in the "Vacation Club" were martial property for purposes of equitable distribution. The master further found that the real property owned by Husband in Robinson Township, Washington County, Pennsylvania (the Gun Club property), was premarital and had no increase in value during the twenty-eight (28) month term of the marriage.

Finally, the master addressed Wife's allegation that Husband had an ownership interest in the business known as Greater Pittsburgh Trap & Skeet, Inc. (the Gun Club), and that she was entitled to an award of some portion of the increase in the value of the business that may have accrued during the marriage. Master Ferito found that the corporation was a non-marital asset and was solely owned by Husband's mother. Moreover, Wife made claims for distributions of assets from the business of the Gun Club. Master Ferito found that, although it had been previously determined that Husband managed and controlled the business of the Gun Club, he did not have any ownership interest in the business and therefore, neither the business nor any appreciation in value would be considered as marital property for purposes of equitable distribution.[10]

---

[9] Investment accounts existed with Coles Partnership, Bear Sterns, and Capital Financial and were not listed in the prenuptial agreement, these accounts were funded from of previous premarital investments.
[10] Prior to his retirement, master Panian actually found that Husband was the owner of the Gun Club in his recommendation to the Court regarding alimony pendente lite. In denying Husband's exceptions to the master's recommendation in 2006, the trial court did not need to reach the issue for the purpose of determining alimony, finding that although Husband claimed he had no ownership of or income from the Gun Club, Husband should have in any case an imputed income based on the Gun Club's income and assets.

7

After making the above findings, the master concluded that the marriage between the parties was irretrievably broken and that the parties had lived separate and apart for a period in excess of two years. Therefore, the entry of a Decree in Divorce pursuant to §3301(d) of the Divorce Code was appropriate. In addition, the master found that an order of equitable distribution and an award of alimony were appropriate in this case, but that an award of counsel fees and expenses was not. With regard to equitable distribution, the master recommended as follows:

1.      The stone from the engagement ring should be distributed to Husband in accordance with the agreement found to have been made between the parties.

2.      The time share with Festiva Resorts having a value of $11,076.00 should be distributed to Husband in consideration of the $8,000.00 credit to which Husband is entitled per the prior Orders of Court.

3.      Vacation Club memberships having a value of $2,500.00 should be distributed to Wife.

4.      Husband shall make a cash payment to Wife in the amount of $576.00 plus return the wedding dress or pay to Wife an additional sum of $498.00.

Regarding alimony, the master recommended that Husband pay alimony to Wife in the amount of $1,000.00 per month for a period of twelve (12) months from the date of the final order. Finally, the master found that the majority of the fees and expenses incurred by Wife in this action were not reasonable since it appeared that they were

8

incurred in an attempt to litigate issues that had already been decided by the trial court. Consequently, the master recommended that no further fees, costs or expenses should be awarded to Wife.

On May 25, 2009, Wife, through her attorney, filed lengthy exceptions to the Master's Report and Recommendation. Her exceptions alleged, *inter alia*, that the master failed to make an appropriate award of attorney fees and costs, that the master failed to make appropriate findings regarding the size and value of the marital estate, and that he demonstrated bias against Wife and partiality toward Husband. Wife argued that the master's refusal to consider competent evidence regarding Husband's criminal background, and that his refusal to hear expert testimony regarding the appreciation to the Gun Club business was not only error but demonstrated his bias toward Wife.

On June 9, 2009, Husband filed cross exceptions alleging that the master erred in two respects: (1) that the master failed to assign a value to the diamond engagement ring, such that if Wife were to claim that she does not have it, no value can be attributed to it for distribution purposes, and (2) that the master awarded alimony when this case involved a marriage lasting only 28 months before separation. Husband further argued that five years elapsed between the date of separation and the date of the Master's Report and that he had been paying alimony *pendente lite* ("APL") in the amount of $1,086.00 per month for five years. Because an excess of $60,000.00 had already been paid by Husband to Wife, Husband argued that the Master should not have recommended that the Court award alimony. Upon receiving Wife's Exceptions and Husband's Cross Exceptions, the Court scheduled argument for September 1, 2009 and set a briefing schedule.

9

On October 2, 2009, Wife presented a petition for enforcement, alleging that Husband failed to make timely APL payments for the months of July, August and September of 2009, and seeking an order directing Husband to pay to her the sum of $3,258.00 for delinquent support and an additional $500.00 in counsel fees for the preparation and presentation of the motion. Upon consideration of the motion, and after reviewing exhibits evidence Husband's significant investment accounts, the court granted Wife's Petition and ordered Husband to pay the above amounts to Wife or suffer further sanctions.

On November 23, 2009, Wife presented another petition for enforcement, alleging that Husband failed to make timely APL payments for the months of July, August, September, October and November of 2009. As the APL award was for $1,086.00 per month, Wife averred that Husband owed her $5,430.00. In addition, she sought $500.00 in attorney fees for the preparation and presentation of the second motion. Upon consideration of the motion and upon hearing argument on the matter, the trial court granted Wife's motion and ordered that Husband pay the above amounts to Wife. . On December 1, 2009, Wife petitioned the court to reduce Husband's outstanding APL and attorneys' fees to judgment, which the court granted, and judgment was entered in the amount $5,943.00.

On February 26, 2010, after receiving the master's Report and Recommendation, to which both parties filed exceptions, and having heard argument by both parties on September 1, 2009, the court held that both Husband and Wife's exceptions were granted in part and denied in part. With respect to the parties' prenuptial agreement, the court found that the provision excluding "proceeds" of premarital assets did not preclude

10

consideration of the appreciation of premarital property as part of the marital estate. Accordingly, the court granted Wife's exception and ordered that the parties' marital property shall include the increase in value of any non-marital property during the time of the marriage. Furthermore, the court denied Wife's exception regarding the master's failure to make findings regarding whether Husband had made full disclosure to her prior to the parties' execution of the prenuptial agreement.

The trial court next addressed the parties' exceptions relating to Husband's ownership interest in the Gun Club. First, Wife alleged that the master failed to follow the "law of the case" in this matter as it relates to the ownership of the Gun Club. The court found that there was no prior ruling regarding the ownership of the Gun Club; rather, the court merely attributed to Husband an earning capacity equal to the amount of income that he was generating on behalf of the Gun Club, while claiming to receive no compensation therefor. Thus, the court denied this exception.

Next, Wife argued that the master failed to give appropriate weight to Husband's admissions that he was the owner of the Gun Club. Wife also alleged that the master failed to give weight to Husband's operational control of the Gun Club, as further indicia that he was the owner of the Club. The trial court granted these exceptions and found that Husband had, on numerous occasions, acknowledged his ownership of the Gun Club, including in the Gun Club's corporate tax returns, firearm sales license application, and investment paperwork. Husband further admitted his unfettered control of the Gun Club's business operations, revenues, bank accounts and financial securities.[11] Therefore, the trial court held that Husband was the actual owner of the Gun Club,

---

[11] Freund Deposition Pages. 12-15.

11

despite his allegations that his mother was the sole owner of the Gun Club's corporate shares.

Based on these findings, and as set forth above, the trial court granted Wife's exception to the master's refusal to allow expert testimony regarding the appreciation of the Gun Club, during the marriage. The court scheduled a hearing for July 12, 2010, to take testimony solely on the issue of the increase in value of the Gun Club, at which time both Husband and Wife were given an opportunity to present expert testimony and other evidence in this regard.

The trial court next addressed the parties' exceptions relating to the master's recommendations regarding alimony *pendente lite*, alimony, and counsel fees. First, the Court granted Husband's exception to the master's recommendation that he should pay Wife $1,000.00 per month for a period of twelve (12) months as alimony. After consideration of the testimony of both parties, as well as consideration of the effect of the court's rulings on the parties' other exceptions, the court determined that post-divorce alimony was not warranted in this case. The court granted Wife's exception to the master's recommendation that Husband should not pay additional counsel fees over and above the previously ordered amount of $8,500.00. After considering the testimony, the court found that additional attorney's fees were warranted, but left open the amount pending further proceedings. In consideration of Husband's exception regarding the order of alimony *pendente lite*, the trial court granted the motion and terminated the APL order, effective September 14, 2009, and directed that any arrearage paid by Husband to Wife be applied as an offset to any additional equitable distribution, pending completion of the proceedings.

12

Finally, the trial court addressed the parties' remaining five miscellaneous exceptions. The court granted Wife's exception to the master's finding that evidence of Husband's prior convictions for theft by deception, insurance fraud and other various offenses were inadmissible. The court disagreed with the master, finding that these offenses involving *crimen falsi* were admissible to impeach the credibility of Husband, particularly regarding his claims that he had no ownership interest in the Gun Club that he had been managing.

Both parties filed exceptions concerning the engagement ring. Husband alleged that the ring's main stone should be returned to him as it was a family heirloom. The court granted Wife's exception, but denied Husband's exception regarding the engagement ring, holding that Pennsylvania law is clear that engagement rings are conditional gifts that are made absolute upon the occurrence of the marriage.[12] Accordingly, the court found that Wife was entitled to keep the ring and refused to assign a monetary value to it for the purpose of equitable distribution.

The court denied Wife's three remaining miscellaneous exceptions. The court declined to find that Husband's Ford Taurus was marital property; denied Wife's exception to the master's finding that Husband's financial investments were covered by the prenuptial agreement; and denied Wife's exception to the master's finding that she had ample opportunity to obtain any and all items of her personal property.

Following the issuance of the order regarding the exceptions, the court was notified by the parties' counsel that they were in the process of settling the remaining issues. However, On August 9, 2010 the Court received notice that the parties could not reach an agreement and that a hearing would be necessary to resolve the remaining issue

---

[12] *Lindh v. Surman*, 742 A.2d 643 (1999).

13

of the Gun Club. The court scheduled a hearing for January 31, 2011 to determine the fair market value and appreciation in value during the marriage of the Gun Club, i.e. the Greater Pittsburgh Trap and Skeet, Inc.

Both parties filed briefs prior to the hearing, and upon consideration of the briefs and testimony, the court found that the fair market value of Husband's 100% equity in the Club was $275,094 as of May 31, 2001, about the date of the marriage, and $400,082 as of May 31, 2004, about the date of separation. Because the court had previously held that the increase in value was a marital asset, it held that the aggregate increase in its value during the marriage was $124,988, and that Wife was entitled to 60% of the appreciated value of the Gun Club, or $74,992.80. Finally, the Court addressed the issue of counsel fees that it had previously left open in its February 26, 2010 order, and ordered that Husband pay $18,597.30 in legal fees to Wife within 30 days.

Following this order, Wife, through her attorney, presented a motion for reconsideration. The motion alleged that, through an oversight, the court failed to address $28,863.40 in expenses incurred for expert testimony relating to the valuation of Husband's business. Wife sought clarification of the order as to whether the court intended that she bear the cost of retaining her expert or, if the court's omission was not intentional, that the order be amended to allocate the costs of her expert. Upon consideration of the motion, the court awarded Wife an additional $25,463.40 to reimburse her for costs incurred in hiring an expert to prepare and present the valuation of Husband's business enterprise.

Following the trial court's entry of a decree in divorce and equitable distribution dated April 14, 2011, Husband filed an appeal to the Superior Court, docketed at No. 779

14

WDA 2011. By Memorandum Opinion dated November 8, 2013, the Superior Court found that, with respect to the trial court's decision regarding the value of the marital estate, the estate of Husband's mother, Margaret Freund, her heirs, and the corporation known as Greater Pittsburgh Trap and Skeet, Inc. (the "Gun Club") were indispensable parties to the litigation "because any equitable distribution scheme would affect their rights in the property."[13] Although the Superior Court acknowledged that this case did not involve the distribution of any of the Gun Club's assets or assets of Mother's estate, the Superior Court vacated the order of equitable distribution and directed "the trial court to join these parties and conduct a *de novo* hearing."[14]

The Superior Court further addressed the issue of the prenuptial agreement between the parties. The trial court had ruled previously that the parties' prenuptial agreement did not exclude any "increase in value" or appreciated value of premarital assets from being included in the marital estate for distribution. Although the Superior Court did not reverse the trial court's finding that the increase in value of the Gun Club be included in the marital estate for distribution, the Court held:

> Ultimately, resolution of this issue will depend on the trial court's decision concerning ownership of the Gun Club. Once all indispensable parties are properly joined, the trial court must determine with whom ownership of the corporation lies. If, after engaging in the proper analysis, the court determines that the corporate veil should be pierced, then it must determine whether the business falls within the categories of property excluded by the agreement. To resolve the issue, the court may need to take testimony regarding the parties' intent in signing the agreement. *Raiken v. Mellon,* 582 A.2d 11, 13 (Pa.Super. 1990) (When interpreting a prenuptial agreement, the court, as in dealing with an ordinary contract, must determine the intention of the parties.")
> Order vacated. Case remanded. Jurisdiction relinquished. (Emphasis added).[15]

---

[13] Superior Court Opinion, No. 779 WDA 2011, p. 17, note 5.
[14] *Id.*
[15] *Id.,* p. 21.

15

Upon receipt of the Superior Court's remand order, the trial court scheduled a status conference for the parties for April 29, 2014. At request of the parties and by their consent, the status conference was rescheduled for July 28, 2014.

Following the status conference, the trial court entered an order dated August 5, 2014, ordering that the caption of the case be amended in accordance with the Superior Court's order to include as additional defendants, Greater Pittsburgh Trap and Skeet, Inc. (the "Gun Club"), M. Constance Gato, Executrix under the Last Will and Testament of Margaret S. Freund, deceased (hereinafter referred to as "Mother's estate"), and the individual heirs of Mother's Estate, M. Constance Gato, Mary Dawn Drummond, J. Donald Freund (Husband), and Mark J. Freund. The trial court further ordered that a hearing be scheduled for November 14, 2014, to address the issues raised by the Superior Court in its order of remand. At the request of the parties and with their consent, the trial court rescheduled the hearing for February 17, 2015.

On October 30, 2014, Wife filed her Second Amended Complaint Joining Additional Defendants, naming the Gun Club corporate entity, Husband's Mother's estate, and those heirs of the Mother's estate as set forth in the trial court's order. In paragraph nine of the Second Amended Complaint, Wife averred that Husband was the actual owner of the Gun Club, that he exercised exclusive dominion and control over the Gun Club and its assets and income, and that Mother had nothing to do with the Gun Club. In paragraph ten of the Second Amended Complaint, Wife averred that the Gun Club ceased business operations upon Husband's arrest in October of 2008 (for firearms violations he committed in collusion with the Gun Club and his sister, M. Constance Gato).

16

On December 14, 2014, attorney John D. Eddy, Esquire, on behalf of the additional defendants, filed an Answer and New Matter admitting as true paragraphs nine and ten of the Second Amended Complaint.[16] The additional defendants averred that they were without sufficient knowledge or information to admit or deny that Husband was the true owner of the Gun Club.[17]

In their New Matter, additional defendants averred that Mother's estate had "interpleaded the sum of $130,000.00 in this action," representing Wife's award of equitable distribution entered prior to the remand, and thereby should be discharged from any further liability that Husband owes to Wife.[18] In their New Matter, additional defendants further averred that Mother's estate has no further interest in the instant equitable distribution proceedings.[19] Additional defendants further averred that the Gun Club's corporate entity was formally dissolved by the filing of Articles of Dissolution on November 7, 2012, and that the Gun Club has no vested interest in any assets which were distributed through the Mother's Estate.[20] Finally, in their New Matter, additional defendants averred that they "have no justiciable interest in the controversy."[21]

On December 19, 2014, Husband filed his Answer to the Amended Complaint Joining Additional Defendants and Reply to New Matter of the additional defendants.

On February 17, 2015, at the time set for the hearing before the trial court, attorney Eddy appeared on behalf of the additional defendants and reiterated, on the

---

[16] Additional Defendants' Answer and New Matter to Second Amended Complaint, ¶s 9 and 10.

[17] Additional Defendants' Answer and New Matter to Second Amended Complaint, ¶ 6.

[18] Additional Defendants' Answer and New Matter to Second Amended Complaint, ¶ 22.

[19] Additional Defendants' Answer and New Matter to Second Amended Complaint, ¶ 25.

[20] Additional Defendants' Answer and New Matter to Second Amended Complaint, ¶s 26 and 27.

[21] Additional Defendants' Answer and New Matter to Second Amended Complaint, ¶s 28.

17

record, that the additional defendants had no interest to protect in the equitable distribution proceedings before the trial court.

On February 17, 2015, pursuant to the recommendation of the Superior Court, Wife offered testimony of her understanding of the prenuptial agreement between the parties. Wife testified that her intention by entering into the prenuptial agreement was that the land and building that Husband owned would "remain with him" if anything would happen during the course of the marriage. Wife further testified that Husband's interest in the Gun Club business or the corporation was never discussed in this context. Wife further testified that she did not entirely understand the prenuptial agreement, signed a few days before the wedding. Wife was unable to shed any further light as to her understanding of any of the other terms and conditions of the prenuptial agreement or any omissions therefrom. Husband, although present at the hearing and represented by counsel, offered no testimony and no further evidence.

In accordance with the Superior Court's order of remand of November 8, 2013, the trial court, at the request of the parties, reviewed the voluminous exhibits, transcripts and expert reports that had been previously submitted to the divorce master, without any additional need for the presentation of the case. In addition to review of the new pleadings, as set forth above, including the Second Amended Complaint Joining Additional Defendants and the Additional Defendants' Answer and New Matter thereto, the trial court considered the limited testimony and exhibits offered by the parties at the hearing of February 17, 2015.

In addition, the trial court reviewed the transcript of the guilty plea proceedings dated January 20, 2009, offered as an exhibit on behalf of Wife, in the matter of *United*

18

*States v. Joseph Donald Freund,*[22] concerning the criminal offenses Husband was charged with, arising out of his operation of the Gun Club. According to the transcript of the proceedings, on January 20, 2009, Husband pled guilty to a six count criminal information including:

Count 1, that between April 6, 2004 and April 18, 2006, Husband knowing conspired with defendants, Greater Pittsburgh Trap and Skeet, Inc. (the Gun Club) and Constance Gato (his sister), both additional defendants named herein, to defraud the United States and obstruct an agency of the United States, the Bureau of Alcohol, Tobacco and Firearms and Explosives (the "ATF"), in its lawful function to control and regulate the sale of firearms and ammunition and to inspect records of the sale of firearms;

Count 2, that between April 6, 2004 and April 18, 2006, Husband and the co-defendants knowingly made false statements and representations of firearm transaction records;

Count 3, that Husband and the Gun Club knowingly sold a .40 caliber Glock pistol to an ineligible person; and

Count 4-6, that from April 2, 2004 to April 18, 2006, and July 9, 2008, Husband knowingly possessed firearms and ammunition while a convicted felon.[23]

As set forth, both the Gun Club and Husband's sister, additional defendant M. Constance Gato were charged as co-conspirators by the ATF. Husband's Mother was not charged in the criminal information, likewise her estate was not charged. During the

---

[22] In the United States District Court for the Western District of Pennsylvania, Criminal Action No. 08-382. A copy of the transcript was made a part of the record. The transcript was also included in the Supplemental Reproduced Record of Appellee in Husband's appeal before the Superior Court docketed at No. 779 WDA 2011, pp. 367-404.

[23] U.S. v. Joseph Donald Freund, Guilty Plea proceedings, January 20, 2009, pp. 3-4.

19

proceeding, Husband admitted his guilt to the charges and admitted his culpability in possessing and selling firearms and ammunition from the Gun Club and having Ms. Gato sign the ATF forms and records in order to permit Husband to do so. The ATF records were completed to indicate that Ms. Gato or others were the seller, when in fact Husband was the actual seller of the firearms:[24]

> U.S. Attorney: At all times material to the [criminal] information, Mr. Freund [husband] and Ms. Gato were officers, directors, employees, and or other agents of Greater Pittsburgh Trap and Skeet and the actions that they undertook were with the intent to benefit Greater Pittsburgh Trap and Skeet.
>
> For example, Mr. Freund listed himself director. At various times, manager, **owner** of Greater Pittsburgh Trap and Skeet. And Ms. Gato listed herself as the director, secretary, treasurer, and officer of Greater Pittsburgh Trap and Skeet (emphasis added).[25]

> \* \* \*

> On April 4 of 2004, the defendant acknowledged to the ATF that he had a prior conviction which made it unlawful for him to possess, transfer, or sell firearms.
>
> Two days later, on April 6 of 2004, Ms. Gato, acknowledged to the ATF that she was a corporate officer of Greater Pittsburgh Trap and Skeet.

---

[24] U.S. v. Joseph Donald Freund, Guilty Plea proceedings, January 20, 2009, pp. 18-24.
[25] U.S. v. Joseph Donald Freund, Guilty Plea proceedings, January 20, 2009, pp. 18-19.

20

On April 22 of 2004, Ms. Gato indicated that she was aware of the defendant's conviction and asked that he be removed as a, quote, "responsible person," end quote, from the federal firearms license granted to Greater Pittsburgh Trap and Skeet. The next day, she submitted a letter to that regard to the ATF.

Between April 6 of 2004 and April 18 of 2006, daily, Mr. Freund, the defendant here, continued possessing and selling firearms and ammunition from Greater Pittsburgh Trap and Skeet. Ms. Gato would sign the forms and records required by ATF and federal law in order to permit the defendant to continue doing so. Those records would then indicate that Ms. Gato or others were the seller, when, in fact, the defendant was the actual seller in those particular scenarios.

Records gathered by the ATF indicate that over one hundred fifty firearms were transferred or sold through Greater Pittsburgh Trap and Skeet during this time frame. The gross majority of those by Mr. Freund, mostly listing Ms. Gato as the seller, although she was not.[26]

\* \* \*

In essence, your Honor, if I had to boil this down, after the defendant's [prior felony] conviction, things progressed as normal as beforehand. The defendant continued to sell and possess firearms at the Greater Pittsburgh Trap and Skeet.

---

[26] U.S. v. Joseph Donald Freund, Guilty Plea proceedings, January 20, 2009, pp. 20-21.

21

Appendix C

And the mechanism by which he did so was that his sister would either sign or allow him to sign the paperwork, indicating that she was the seller, when it was the defendant who was.

You also heard about the different sales and attempted sales to various people on five different occasions.

That would, in essence, Your Honor, be the factual summary in this particular matter.[27]

\*　　　\*　　　\*

The Court:　Do you agree with the government's summary of what you did?

Defendant [Husband]: Yes, Your Honor.[28]

\*　　　\*　　　\*

Defense Attorney:　We have no disagreement with the summary, particularly, the legal effect of the summary. This activity of operating the gun club was a lifetime interest of the client. He should have given it up after his State court conviction, but he just couldn't do it. And didn't do it.

He deeply regrets involving [his sister] Constance Gato in this, this matter, whose role seems to be much larger than it actually was.[29]

The trial court notes that Husband's Mother was not charged in this criminal case, however the Gun Club and Husband's sister were charged as co-conspirators. At no time during the proceedings did Husband claim that he was merely the manager hired by his

---

[27] U.S. v. Joseph Donald Freund, Guilty Plea proceedings, January 20, 2009, pp. 23-24.

[28] U.S. v. Joseph Donald Freund, Guilty Plea proceedings, January 20, 2009, p. 24.

[29] U.S. v. Joseph Donald Freund, Guilty Plea proceedings, January 20, 2009, p. 25.

22

Mother to run the Gun Club. Husband expressed his regret to the Federal judge for getting his sister involved in the criminal charges, but at no time did he indicate despondence for involving his "Mother's" Gun Club as a co-conspirator.[30] In fact, at no time during the criminal proceedings is Mrs. Freund mentioned, nor is there any statement that Husband was running the Gun Club for his Mother.

Following the trial court's evidentiary hearing and after review of the entire record, the court entered its order of July 15, 2016, holding that:

1. Husband is the *de facto* or true owner of the Gun Club, which is a premarital asset;

2. The prenuptial agreement between the parties dated November 27, 2004, does not exclude the increase of value or appreciation of premarital property;

3. The increase in value of the Gun Club during the course of the marriage, is marital property subject to equitable distribution in accordance with 23 Pa.C.S.A. § 3501(a);

4. In accordance with 23 Pa.C.S.A. § 3501(a.1), Husband's equity interest in Greater Pittsburgh Trap & Skeet, Inc., is found to be $275,094 as of May 31, 2001 (a date in proximity to the date of the parties' marriage) and $400,082 as of May 31, 2004 (a date in proximity to the date of separation), thus the aggregate increase in its value for equitable distribution purposes to be $124,988;

---

[30] According to the transcript of the guilty plea proceedings, the Gun Club was scheduled to enter a plea of guilty to the charges later the same morning, January 20, 2009. U.S. v. Joseph Donald Freund, Guilty Plea proceedings, January 20, 2009, p. 38.

23

5. For equitable distribution, Wife is entitled to sixty percent (60%) of the increase in value of Gun Club or $74,992.80.

The trial court accordingly ordered that Husband pay to Wife the amount of $74,992.80, plus an additional $18,597.30 in legal fees and $28,863.40 in expert fees, as previously ordered, and ordered that all other provisions of the trial court's amended order of equitable distribution and final divorce decree dated April 14, 2011, shall remain in full force and effect.

This appeal followed.

## Legal Analysis:

On this appeal, Husband raises the following issues for the Superior Court's review:

(a) Whether the trial court erred as a matter of law and/or abused its discretion in relying on a transcript from an unrelated proceeding that was never offered or received into evidence, when rendering its decision;

(b) Whether the trial court erred as a matter of law and/or abused its discretion in determining that the increased value of a corporation which Appellant managed but in which he never held any ownership interest, constituted marital property subject to equitable distribution;

(c) Whether the trial court erred as a matter of law and/or abused its discretion by misapplying the doctrine of 'piercing the corporate veil" or otherwise in ignoring the corporate form to determine that Appellant was the "de facto" owner of said corporation;

24

(d) Whether the trial court erred as a matter of law and/or abused its discretion in automatically awarding attorney fees without considering Appellee's ability to pay; and

(e) Whether the trial court erred as a matter of law and/or abused its discretion in determining that Appellee did not waive her right to appreciation and/or increase in value of premarital property under the terms of the parties' prenuptial agreement.

Although not specific, Husband's first issue presumably regards the trial court's consideration of the transcript of Husband's sentencing proceedings in Federal court dated January 20, 2009, after he pled guilty to certain criminal offenses arising out of his operation of the Gun Club.[31] As set forth above, the transcript of these criminal proceedings was offered into evidence as an exhibit and made a part of the record on motion of Wife's counsel. At no time did Husband or his counsel object to the entry of the transcript. Therefore, this issue has been waived. See *Tecce v. Hally*, 106 A.3d 728, 732 (Pa.Super. 2014), "[i]t is axiomatic that, to preserve an objection for appeal, the objection must be raised before the trial court." In any case, even had Husband lodged an objection to the introduction of this transcript, the objection would have properly overruled, since Husband's admissions regarding his ownership and operation of the Gun Club to the Federal judge would certainly be relevant to the issue at hand. See *Stumpf v. Nye*, 950 A.2d 1032, 1035–36 (Pa.Super.2008), appellate "review of a trial court's decision to admit or exclude evidence is well-settled . . . decisions on admissibility are

---

[31] See *United States v. Joseph Donald Freund*, United States District Court for the Western District of Pennsylvania, Criminal Action No. 08-382.

25

within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law."

Furthermore, Husband's conviction for federal firearms charges arising out of his operation of the Gun Club and his admissions at sentencing are matters of public record. Moreover, during the course of the equitable distribution proceedings, the court was made well aware that Husband had been indicted, arrested and was facing these charges. At the time of the hearing to determine the fair market value and appreciation of the Gun Club, January 31, 2011, Husband's counsel asked the court to excuse Husband's inability to attend, because he was serving his federal sentence at that time. The trial court would be remiss to completely ignore these circumstances, and rather, could take judicial notice that Husband had pled guilty to criminal charges arising out of his ownership and operation of the Gun Club. See *Joyce v. Erie Ins. Exchange*, 74 A.3d 157 (Pa.Super. 2013), which held that it was appropriate, in a civil proceeding for the trial court to take notice of the federal criminal proceedings against the appellant, and that "proof of a defendant's conviction [is] conclusive evidence of the crime for which he was convicted." *Joyce, supra*, 74 A.3d at 165, citing *Hurtt v. Stirone* [416 Pa. 493], 206 A.2d 624 (Pa.1965).

In the instant case, the trial court did not rely as much on Husband's conviction in Federal court, but rather his admissions before the sentencing judge that he acted as the owner and operator of the Gun Club, and that he would sell firearms and ammunition from the Gun Club, but have his sister, M. Constance Gato sign the ATF forms and records as the seller, when in fact Husband was the actual seller of the firearms. Moreover, the trial court did not completely "rely" on the transcript of the criminal

26

proceedings in reaching its decision, but rather, viewed Husband's admissions in light of all of the other evidence to conclude that Husband's Mother was the owner in name only, and that Husband was the actual owner and operator of the Gun Club.

Husband's second and third claims of error challenge the trial court's finding that Husband was the actual or "de facto" owner of the Gun Club, even though the business was titled in his Mother's name. As noted above, the predominant issue of contention in this case has always been Husband's ownership interest in the business of the Gun Club, and, to the extent he is found to have an ownership interest, the increase in value of the business during the marriage. Although the record owner of the corporate business is Husband's Mother, and subsequently her estate, there exist no other indicia of Mother's ownership or participation in the business. As found by the trial court, Husband operates the business, lives in the business premises, owns the property on which the business is located, controls all of the business accounts and commingles those with his personal accounts, but claims to have no ownership interest therein. Husband further claimed to receive no compensation for operating the business even though the business reported significant annual income. The evidence in the record is most compelling to support Wife's assertion that Husband was the actual owner of the Gun Club and its assets and income, including the following:

- Evidence presented to the divorce master indicated that Husband was the sole operator of the Gun Club since 1972 and that his name and social security number appear on the corporate tax returns. Furthermore, his percentage of ownership of stock in the corporation is listed as 100% on corporate tax

27

forms, which Husband signed; Mother's name does not appear on the returns;[32]

- The trial court could assign little credence to the testimony of the tax preparer, Bernard Marx that the designation of Husband on the corporate tax return as 100% owner of the business and the use of Husband's social security number was merely inadvertent, and that the mistake was attributable to the similarity of Husband's name and that of his deceased father; Husband's father had passed away in 1972,[33] and the court could not find credible this explanation for the alleged mistake on the corporate 1120 Forms for the Gun Club filed in 2002 and other years;

- Husband is variously identified as "President," "Treasurer," or "Custodian" for the Gun club on a number of accounts, formerly at National City Bank, and on other documents, but he testified under oath that he is not an officer of the corporation;[34]

- Husband controls all of the reported and unreported revenue of the business and only he is aware of the amounts of those revenues; he does the banking and pays the bills.[35]

- Husband also owns and controls the land and buildings where the business has always operated. Additionally, Husband, in his deposition and other

---

[32] Wife's Exhibit 16, IRS form 1120-A 2002; November 19, 2005 hearing transcript (HT), pp. 73-76, 98-99; Exhibits B and C.
[33] November 19, 2005 hearing transcript (HT), p. 98.
[34] November 19, 2005 hearing transcript (HT), pp. 67, 89.
[35] Gato Deposition Page 29, lls 9-13; November 19, 2005 hearing transcript (HT), pp. 57, 88.

28

testimony, stated that he is personally responsible for the Gun Club's ledgers, banking and corporate records.[36]

- The opinion of Wife's expert, Gregory Clark, CPA, CVA of Brabender Mascetta, LLC, that the operation of the Gun Club and its management was controlled by Husband and that his personal interests were the true beneficiary of the corporate policy.[37] In addition, Mr. Clark found that Husband lived in the downstairs at the Gun Club's facility, which real estate he owns personally. He did not receive rent from the Gun Club for the business use, and the Club's facilities were listed on the Club's depreciation schedule which supports the Club's tax deduction on its corporate tax return. Moreover, the utilities, real estate taxes and repairs for the entire property are paid by the Club, including the portion used by Husband personally.[38]

- Mr. Clark, in his report, also stated that documents illustrated that Husband authorized the consolidation of personal and corporate investments in 2004. Mr. Clark also found that the Corporation operated without paying any compensation to Husband or any other individual purportedly responsible for its operation.[39]

/

---

[36] Freund Deposition Pages 35-36; November 19, 2005 hearing transcript (HT), pp. 57, 88.

[37] See the letter from Gregory Clark to Defendant's counsel, dated December 15, 2004, which included his report, entitled, "Calculation of Net Disposable income of J. Donald Freund Estimated for the Year Ending December 31, 2004.

[38] *Id.*

[39] *Id.;* November 19, 2005 hearing transcript (HT), p. 57.

29

- According to Husband's deposition, when the Gun Club holds competitive "shoots," the cash entry fees go directly into his pocket. Husband then writes checks from his personal account to pay the winner of each "shoot;"[40]

- Husband admitted that his Mother is not involved in the Gun Club, and that no distributions of income have been made to shareholders.[41]

In consideration of the evidence and testimony presented before the divorce master and the trial court, and after review of the same on remand, the trial the court is compelled to attribute the ownership of the Gun Club to Husband. He exercised exclusive control over the business for years and, although he testified that he drew no salary, he enjoyed every benefit of ownership, including residing on the business property and depositing cash payments into his personal bank account. Although Husband claimed that he received no compensation from the Gun Club and had no other reported source of earned income, he had accumulated substantial financial assets in his own name.[42] Husband did not offer expert testimony at the hearing or at any time to attempt to challenge Wife's experts.

In addition to the evidence previously presented, the trial court considered the fact that Husband entered a plea of guilty to the criminal charges relating to his operation of the Gun Club, as set forth above. From the testimony and Husband's admissions during the guilty plea proceeding, the trial court may reasonably infer that Husband was in exclusive control of the Gun Club and its business, to the exclusion of all others. He was

---

[40] Freund Deposition Page 21.

[41] November 19, 2005 hearing transcript (HT), pp. 59, 90.

[42] See the attachment to the prenuptial agreement between the parties, dated November 27, 2001; the trial court also reviewed Husband's financial statements when considering Wife's petition for contempt for Husband's failure to pay Alimony *Pendente Lite*; See also, Wife's Exhibits 71, 32, and 16 and as summarized in Wife's Brief in Support of Exceptions to the Master's Report. August 10, 2009.

30

not the self-less, unpaid manager of his "Mother's" Gun Club business as he would have liked the trial court to believe. It is also reasonable for the trial court to infer, that if Husband was willing to misrepresent records of firearms transactions and attempt to defraud the ATF regarding firearms transactions, at the risk of serious criminal penalties, he would have no issue with attempting to defraud his ex-wife, the family court, or even the IRS, regarding the "paper ownership" of the Gun Club.

Trial courts have broad equitable powers to effectuate justice when fashioning awards of equitable distribution. *Marra v. Marra*, 831 A.2d 1183, 1186-87 (Pa.Super. 2003); *Gill v. Gill*, 677 A.2d 1214, 1216 (Pa.Super. 1996); see also *Reber v. Reiss*, 42 A.3d 1131, 1137 (Pa.Super. 2012), appeal denied 62 A.3d 380 (Pa. 2012). This is not a case where the spouse has re-titled an asset in attempt to shield the business from equitable distribution. Rather, it is clear from all of the evidence that Husband had maintained the Gun Club business in his mother's name for over 30 years for various reasons, including the legal limitations created by his criminal record which precluded his ability to buy and sell firearms legally. Over the course of these 30 years, Husband enjoyed all of the benefits of ownership of the Gun Club, controlling the assets and income of the Gun Club and comingling assets, all for his own benefit. But for the corporate title, his mother being the purported sole shareholder on paper, all indicia of ownership and control demonstrates that Husband is the actual owner of the Gun Club.

Furthermore, the trial court's analysis of Husband's ownership of the Gun Club is not to determine whether it is marital property. Husband's interest in the Gun Club was acquired by Husband long before the marriage. Rather, the trial court's analysis of this asset is for the purpose of assessing the increase in value of nonmarital property in

31

accordance with §§3501(a) and 3501(a.1) of the Divorce Code.[43] As the Superior Court noted in its remand opinion, the Court has "authorized the piercing of the corporate veil when a spouse is the sole shareholder and the corporation's income is used to determine support. *Com. ex. Rel. Maier v. Maier*, 418 A.2d 558, 561 (Pa.Super. 1980). In this case, the trial court essentially did that when it found that Husband had an income equal to that of the Gun Club for the purposes of determining alimony *pendente lite*."[44]

Moreover, the trial court need not "disregard the corporate form" of the Gun Club in order to reach this issue, as suggested by the Superior Court in its order of remand. Whether the Gun Club maintained its corporate formalities is not the question here. Instead, the trial court found that while the Gun Club stock ownership may be titled in the mother's name, Husband was the *de facto* owner of the Gun Club, and managed and controlled its assets and income for his own exclusive benefit. As noted above, the Answer filed on behalf of additional defendants, Mother's Estate and the Gun Club, admits as true Wife's allegation that Husband exercised **exclusive** dominion and control over the Gun Club and its assets and income, and that his Mother had nothing to do with the Gun Club. Husband also admitted that his Mother was not involved in the Gun Club.[45] The additional defendants stopped short of admitting that Husband was the "true owner of the Gun Club," instead averring that they were without sufficient knowledge or information to admit or deny this allegation.[46] This case is more analogous to the reasoning in *Liciardello v. Liciardello*, 570 A.2d 1062, 1064 (Pa.Super. 1990), where the Court upheld the trial court's finding that the parties' son was merely a "straw party" and

---

[43] 23 Pa.C.S.A. §§ 3501(a), 3501(a.1).

[44] Freund v. Freund, No. 779 WDA 2011, Memorandum Opinion, November 8, 2013, p. 15.

[45] November 19, 2005 hearing transcript (HT), pp. 59.

[46] Additional Defendants' Answer and New Matter to Second Amended Complaint, ¶ 6.

32

that the property should be included in the marital estate. See also, *Fitzpatrick v. Fitzpatrick*, 547 A.2d 362, 367 (Pa.Super. 1988) (though title to an automobile was held to be in the corporation, appellee was not estopped to assert any interest in it except insofar as she may have an interest in the corporation as a whole).[47]

Having reconsidered the issue of Husband's ownership interest in the Gun Club, in light of the joinder of the Gun Club, Mother's estate and the heirs of the estate, and in consideration of the pleadings following joinder and the testimony and exhibits of the parties thereafter, the trial court was not dissuaded, and found that Husband is the *de facto* or true owner of the Gun Club. As the Gun Club is a premarital asset, only the increase in its value was considered for equitable distribution, calculated from the date of the parties marriage to the date of their final separation, in accordance with § 3501(a.1) of the Divorce Code.[48]

Having found that Husband is the true owner of the Gun Club, the secondary issue considered upon remand was whether the increased value of the Gun Club is within the categories of property excluded by the parties' prenuptial agreement dated November 27, 2001. The trial court found that the increase in value of the Gun Club during the marriage was not excluded by the prenuptial agreement, and Husband asserts this as his fifth claim of the court's error.[49]

The parties' prenuptial agreement provided, among other things, that all property belonging to either party at the time the agreement was executed as well as any *proceeds* generated by these assets would remain the sole and separate property of the party

---

[47] See also, *Oaks v. Cooper*, 638 A.2d 202, 211 (Pa. 1994). Unlike Mr. Cooper, who treated the corporate farm as his own for agricultural purposes but paid rent and owned and depreciated the farm equipment personally, Husband has no such "arm's length" relationship with the Gun Club.
[48] 23 Pa.C.S.A. § 3501(a.1).
[49] Husband's Concise Statement of Matters Complained of on Appeal, ¶ (e).

33

owning the asset at the time of execution. The agreement did not mention the Gun Club but specifically identified two pieces of real estate, including the property which contained the business of the Gun Club and Husband's residence:

> All interest in that certain piece of real property located at 920 King Road, Bulger, Washington County, Pennsylvania, being more specifically described in Deed Book Volume 8615, page 140, and any subsequent deed. This real estate property is owned by Joseph Donald Freund. It is intended that ownership and/or sale of the property proceeds shall remain in Joseph Donald Freund's family, unless determined otherwise during the lifetime of Joseph Donald Freund.

The agreement further provided that "all stocks, bonds, Individual Retirement Accounts, mutual funds, certificates of deposit, and any and all savings or checking accounts owned solely or jointly by [Husband] prior to this Agreement, including any and all proceeds generated" therefrom would be excluded from the marital estate. The prenuptial agreement did not mention or exclude from the marital estate any appreciation or increase in value of the premarital property, nor did the parties waive their right to claim alimony, alimony *pendente lite* or counsel fees from the other.

> Prenuptial agreements are contracts, and, as such, should be evaluated under the same criteria as are applicable to other types of contracts.
>
> *　　*　　*
>
> Further, everyone who enters a long-term agreement knows that circumstances can change during its term, so that what initially appeared desirable might prove to be an unfavorable bargain. Such are the risks that contracting parties routinely assume. Certainly, the possibilities of illness, birth of children, reliance upon a spouse, career change, financial gain or loss, and numerous other events that can occur in the course of a marriage cannot be regarded as unforeseeable. If parties choose not to address such matters in their prenuptial agreements, they must be regarded as having contracted to bear the risk of events that alter the value of their bargains.

*Simeone v. Simeone*, 581 A.2d 162, 165, 166 (Pa. 1990).

34

Appendix C

At a hearing on November 19, 2004 before the trial court, Husband testified that the prenuptial agreement was prepared by his attorney and was signed in his attorney's office.[50] Husband's attorney read and explained the prenuptial agreement to Wife.[51] Husband admitted that the prenuptial agreement made no mention of the Gun Club.[52] At the hearing, Husband's attorney acknowledged that he prepared the agreement and explained it to Wife, who was unrepresented.[53] Husband's attorney further acknowledged that he made no provision for alimony, alimony *pendente lite* or counsel fees.[54] Wife testified that although she read the agreement and that Husband's counsel explained it to her, she did not understand the prenuptial agreement.[55]

In this case, having the prenuptial agreement prepared by his attorney, Husband chose not to address the Gun Club or his interest therein, perhaps relying on his confidence that keeping it in his Mother's name shielded him from any liability. Likewise, Husband chose not to address or exclude alimony or counsel fees, or the increase in value of nonmarital property. Under the circumstances, Husband must be regarded as having contracted to bear the risk of having to pay alimony and counsel fees, and having the increase in value of his premarital assets included in the marital estate. See *Simeone v. Simeone, supra.*

Furthermore, the trial court cannot find that the provision of the prenuptial agreement excluding the *proceeds* of nonmarital assets from the marital estate also excludes the increase in value of nonmarital assets from the marital estate. Simply put,

---

[50] November 19, 2004 hearing transcript (HT), pp. 20-26.
[51] *Id.*, pp. 29-31.
[52] *Id.*, p. 84
[53] *Id.*, pp. 109-110, 116-17.
[54] *Id.*, pp. 126-27.
[55] *Id.*, pp. 144.

35

the trial court cannot equate the term "proceeds" with "increase in value" or "appreciation," and can find no authority to do so. This case is on point with the facts of *Williamson v. Williamson*, 402 Pa.Super. 276, 586 A.2d 967 (1991), also involving an antenuptial agreement and a husband's premarital business interest, where the Superior Court upheld the trial court's inclusion in the award of equitable distribution the increase in value of the business during the marriage:

> We will address this issue in conjunction with Mr. Williamson's next assertion of error; that is, that the trial court "improperly included the value of the business in the marital assets or included it at an improper value." Appellant's brief, at i. After review, we find that the trial court had ample evidence to conclude that $65,000.00 worth of Mr. Williamson's business was subject to equitable distribution. We adopt the trial court's analysis and rationale regarding this issue. *See* Trial court opinion, June 6, 1989, at 2-3, 5, 6-8, 10, 13-14, 16, 17. *See also* Antenuptial Agreement, Exhibit A. In brief, the trial court found that
>
>> [Mr. Williamson] owned his business before the marriage. The value of his business at the time of the marriage is determined by this Court to be $65,000.00. The value of his business when sold in September 1988 was $130,000.00 There has been an increase of $65,000.00 which would be subject to distribution. [....] The court finds that the value of Williamson Sports Business sold to a bonafide purchaser to be the actual value of the sale, $130,000.00. The value of the business not subject to prenuptial agreement between the parties is $65,000.00. This $65,000.00 increase in value is marital property.
>
> Trial court opinion, June 6, 1989, at 6-7.
>
> First, we note Mr. Williamson's argument. He claims that the trial court assigned an improper value to his business inasmuch as it failed to consider that the franchise was owned by his brother, Carl Williamson. Carl Williamson testified that he was a partner in the business and that he received half of the proceeds when the business was sold. The trial court explicitly rejected his testimony. *See* Trial court opinion, June 6, 1989, at 7, 13-14. Clearly, the finder of fact is entitled to weigh evidence and assess credibility. *Thomson v. Thomson*, 359 Pa.Super. 540, 519 A.2d 483 (1986); *Wilson v. Benjamin*, 332 Pa.Super. 211, 221, 481 A.2d 328, 333 (1984). The finder of fact may believe all, part or none of the evidence

36

presented to it. *Brown v. Brown*, 352 Pa.Super. 267, 507 A.2d 1223 (1986). We will not disturb the trial court's credibility determinations. *Commonwealth ex rel. Caplan v. Caplan*, 236 Pa.Super. 605, 346 A.2d 822 (1975).

Second, a review of the trial court's order indicates that the trial court awarded Mr. Williamson the entire $65,000.00, representing the increase in the value of his business from the time of marriage until the time of its sale. *In addition,* Mr. Williamson received various property, which he alleges was purchased with the proceeds of the sale. He claims that the trial court double-counted assets.

Again, we note that the trial court effectuated a scheme of *equitable* distribution. We find, especially in light of the trial court's opinion and order entered after consideration of Mr. Williamson's "exceptions" to the June 6, 1989 order, that the trial court recognized the full ramifications of its distribution decisions.

\*   \*   \*

*The law on this issue was articulated in Anthony v. Anthony, 355 Pa.Super. 589, 514 A.2d 91 (1986),* wherein this Court held that marital property includes any accretion in the value of pre-marital property, regardless of whether that property was exchanged for other property.

*Williamson v. Williamson, supra,* 402 Pa.Super. at 285-87, 586 A.2d at 971-72.

Similar to the instant case, the trial court in *Williamson* rejected the husband's claim that the business was owned by his brother, and the Superior Court did not disturb that determination. Moreover, in reviewing the trial court's analysis of equitable distribution, the Superior Court noted the distinction between "proceeds" of the business asset in question and the "increase in value" thereof.

In consideration of the foregoing, the trial court again found that the increase in value of the Gun Club over the course of the marriage must be included in the marital estate for the purposes of equitable distribution. The calculation of the increase in value was offered by Wife's expert, David Kaplan CPA/ABV, JD, CVA of Alpern Rosenthal, during the hearing before the trial court on January 31, 2011. Mr. Kaplan evaluated the

37

increase in value of the business from May 31, 2001 through May 31, 2004,[56] using the capitalized cash flow method to value an operating enterprise that also held investment assets. Kaplan testified that because the capitalized cash flow method analyzes the value of the operations, the cash flow, excess working capital and other non-operating assets, it was the most appropriate method in this case.[57] Following a series of calculations, Mr. Kaplan determined that Husband's 100% equity interest in Greater Pittsburgh Trap & Skeet, Inc. was $275,094 as of May 31, 2001 and $400,082 as of May 31, 2004. Therefore, the aggregate increase in the Gun Club's value from May 31, 2001 to May 31, 2004 was $124,988.

Finally, Husband accuses the trial court of committing error and abusing its discretion for "automatically awarding attorney fees without considering Appellee's ability to pay."[58] The trial court submits that this issue has been waived due to Husband's failure to raise the issue following remand. Although Husband filed exceptions to the master's Report, which recommended an award of attorneys' fees, and though Husband challenged this issue on the first appeal to the Superior Court, at no time during the proceedings following remand did Husband attack the propriety of the award of attorneys' fee to Wife. Furthermore, Husband offered no evidence regarding Wife's ability to pay or his ability to pay or any impairment in his ability to pay the attorneys' fees, for the court's consideration. Accordingly, this issue has been waived. See *Yenchi v. Ameriprise Financial, Inc.*, 123 A.3d 1071, 1081 (Pa.Super. 2015), reversed in part on

---

[56] January 31, 2011 hearing transcript (HT), pp. 6-7. Although the parties were married on December 1, 2001 and separated on April 6, 2004, the expert utilized May 31st of both 2001 and 2004 for evaluation purposes because it represented the end of the fiscal year for the company. The expert explained that it is common practice in the business valuation field to use the date closest to the date of valuation for which complete and sufficient financial data is available.

[57] January 31, 2011 HT, pp. 18-19.

[58] Husband's Concise Statement of Matters Complained of on Appeal, ¶ (d).

38

other grounds, 2017 WL 2644473, 6/20/2017 (Pa. 2017), quoting *Thompson v. Thompson*, 963 A.2d 474, 475–76 (Pa.Super.2008), "[o]n appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected;" *see also* Pa.R.A.P. 302(a) ("Issue not raised in the lower court are waived and cannot be raised for the first time on appeal.").

In any case, the award of attorneys' fee in the context of equitable distribution is a matter left to the sound discretion of the trial court, which will not be disturbed absent an abuse of discretion. See, *McCoy v. McCoy*, 888 A.2d 906, 908 (Pa.Super. 2005):

> Our role in reviewing equitable distribution awards is well-settled.
>
> > "Our standard of review in assessing the propriety of a marital property distribution .is whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure." <u>Harasym v. Harasym</u>, 418 Pa.Super. 486, 614 A.2d 742, 746 (1992). "An abuse of discretion is not found lightly, but only upon a showing of clear and convincing evidence." <u>Zollars v. Zollars</u>, 397 Pa.Super. 204, 579 A.2d 1328, 1330 (1990), *appeal denied*, <u>527 Pa. 603, 589 A.2d 693 (1991)</u>.
>
> <u>Mercatell v. Mercatell</u>, 854 A.2d 609, 612 (Pa.Super.2004).

In this case, the trial court did not "automatically" award attorneys' fees as Husband would suggest, but did so only after careful consideration of the assets and earning capacities of the parties, and the protracted nature of the litigation and its complexity. As noted above, for purposes of determining equitable distribution, alimony, and counsel fees and expenses, the court found that Husband had an annual net earning capacity of $54,000.00, while Wife had an annual earning capacity of $23,000.00. This finding was never challenged by Husband. Moreover, as noted above, Husband held significant premarital assets

39

including real estate, investment accounts, retirement accounts and IRA accounts.[59] Wife held no such significant assets.

The purpose of an award of counsel fees is to promote the fair administration of justice by enabling the dependent spouse to maintain or defend the divorce action without being placed at a financial disadvantage, and to place the parties "on par" with one another. See *McCoy v. McCoy, supra,* 888 A.2d at 909, quoting *Teodorski v. Teodorski,* 857 A.2d 194, 201 (Pa.Super.2004) (quoting *Anzalone v. Anzalone,* 835 A.2d 773, 785-86 (Pa.Super.2003)). As set forth in the lengthy procedural history, this case involved protracted litigation and complex issues, including the issue of the true ownership and value of the Gun Club business, which required expert analysis. Husband continues to insist that the Gun Club business is not subject to equitable distribution proceedings, because he had attempted to shield it in his Mother's name, despite the overwhelming evidence to the contrary. Wife would not have been able to afford the necessary experts and continued legal representation, to endure the prolonged litigation, without an award of attorneys' fees.

> we are bound by our standard of review and may not reverse the grant of counsel fees unless the trial court abused its discretion. "An abuse of discretion entails a misapplication of the law or a manifestly unreasonable judgment in light of the record." *Stackhouse v. Stackhouse,* 862 A.2d 102, 104 (Pa.Super.2004). Under the circumstances here, we cannot conclude that the court's decision was manifestly unreasonable.

*McCoy v. McCoy, supra,* 888 A.2d at 910.

---

[59] See note 42, *supra.*

40

## Conclusion:

Based on the foregoing, and in consideration of the review of the voluminous record, the trial court respectfully submits that the order of court dated July 18, 2016, be affirmed.

BY THE COURT:

Date: 7/18/17

John F. DiSalle, J.

41